# THE

# NEW YORK SUPPLEMENT

## VOLUME 143

---

NORTHLAND RUBBER CO., Inc., v. INTERNATIONAL AUTO-
MOBILE LEAGUE et al.

(Supreme Court, Equity Term, Erie County. August, 1913.)

1. INJUNCTION (§ 57*)—VIOLATION OF CONTRACT—CANCELLATION.

An injunction will not be granted to restrain defendant's alleged vio-
lation of certain written contracts, where it appeared that before suit
brought the parties on a sufficient consideration had agreed to cancel the
contracts and terminate their relations by a settlement, in the absence
of evidence that the settlement agreement had been modified or waived.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 111–113, 130;
Dec. Dig. § 57.*]

2. SPECIFIC PERFORMANCE (§ 61*)—PARTIAL TERMINATION OF CONTRACT—EN-
FORCEMENT.

Plaintiff, after terminating and canceling part of a contract, cannot
enforce its remaining provisions in equity.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§
183–187; Dec. Dig. § 61.*]

Suit by the Northland Rubber Company, Incorporated, against the
International Automobile League and others, for continuance of a tem-
porary injunction. Denied.

George C. Riley, of Buffalo, for the motion.

Henry W. Killeen, of Buffalo, opposed.

LAUGHLIN, J. This is a suit in equity to enjoin violations of cer-
tain contracts made in writing on the 6th day of December, 1911,
and the 30th day of September, 1912, respectively, by the plaintiff
and the defendant the International Automobile League, which for
brevity will be alluded to as the "League," and for damages for such
violations and for the sum of $26,306.93, alleged to be a balance due
and owing to the plaintiff from the League by virtue of another con-
tract in writing bearing date September 30, 1912, executed by the
plaintiff and the League on an accounting in and by which it was
agreed that the balance then owing from the League to the plaintiff
was the sum of $61,306.93.

The allegations of the complaint in so far as they relate to the
plaintiff's claim to be entitled to said sum of $26,306.93 may be elimi-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

143 N.Y.S.—1

nated from consideration on this motion, for they merely show a cause of action at law, and no facts are alleged on which the plaintiff would be entitled to equitable relief with respect to that item.

The plaintiff is a domestic corporation. It was incorporated in August, 1910, under the name International Automobile League Tire & Rubber Company, to manufacture and deal in automobile tires, tubes, and accessories. Its name was duly changed to Northland Rubber Company, Inc., by order of the court on the 20th day of January, 1913. The League is also a domestic corporation, and it was incorporated, about a year prior to the incorporation of the plaintiff, to sell automobile tires and accessories to holders of contracts with it at or below dealers' prices, and ever since its incorporation it has been and is, in effect, owned and controlled by the defendant Alfred C. Bidwell, its president, who was instrumental in incorporating the plaintiff for the purpose of co-operating with the League in furnishing automobile tires, tubes, and accessories to the stockholders of the League holding its contracts for such supplies at manufacturers' prices. At the outset Bidwell dominated and controlled both corporations. After the plaintiff and the League had established and continued business relations for some time pursuant to various contracts, they entered into a contract in writing on the 6th day of December, 1911, by which the former agreements were readjusted, modified, and merged in that contract, and the provisions of the former agreements not incorporated in that contract were expressly abrogated.

The contract of December 6, 1911, recites that about one-half of the capital stock of the plaintiff had been sold by the League at par and its commissions for sales theretofore made were agreed upon; and it was provided that in an accounting for such sales the League should be allowed a specified amount for the premises No. 270 North Division street and a factory site on Northland avenue, title to which, it was recited, was then in the plaintiff, and the League was constituted plaintiff's sole sales agent, on a specified commission basis, for the unsold capital stock of the plaintiff until 9,500 shares of a total authorized issue of 10,000 shares were sold. It was provided that such sales should be made through the agencies theretofore employed by the League and on a general prospectus to be authorized and approved by it, and that all payments of stock subscriptions should be by checks, drafts, or money orders to the order of the plaintiff and should be immediately delivered by the League to the plaintiff. The plaintiff agreed to issue to each subscriber to its capital stock whose subscription was fully paid a contract obligating it to furnish the tires manufactured by it at cost, and agreed to build and equip a plant to manufacture tires and tubes, and the League agreed to adopt plaintiff's tires and tubes as the official tires and tubes of the League and to advertise the same by pamphlets and circulars and in its official catalogues and journals in all editions sent out to members, and endeavor to advance the sale thereof, and agreed to give plaintiff's officers access to its membership files. Paragraph 12 of that contract provides as follows:

"It is further agreed that the said League will, by means of its agency forces established throughout the United States and Canada, and consisting

of about three hundred representatives and established agencies, do all things necessary and proper to promote the publicity and sale of the tires, tubes and products manufactured by the tire company, and will use its utmost endeavor to induce all of the contract holders of said League to purchase and, use the products of the said tire company; and the said tire company likewise agrees to sell to the said League so long as said League remains in, business, all styles of tires and tubes to be manufactured by said company at prevailing automobile manufacture's market prices."

With an exception, which need not be considered, it was agreed that not more than ten shares of the capital stock of the plaintiff should be sold to any one party. It was further expressly agreed that the obligation of the League to sell plaintiff's tires and tubes as the official tires and tubes should be operative *only* while said Bidwell remained president or general manager of the plaintiff and general manager or in any way connected with the League. On August 24, 1912, Bidwell was removed as general manager of the plaintiff, and it appears by affidavit that on the 13th day of February, 1913, he resigned as its president. It is alleged in the complaint that at the time the agreements of September 30, 1912, were made Bidwell placed his resignation as president and director of the plaintiff in the hands of his attorney under an agreement "that the same should be delivered in the event that he again violated his obligations to the plaintiff, or did anything inimicable to its interests"; and it is further alleged, in effect, that on the discovery by the plaintiff of the fact that the League and Bidwell falsely and fraudulently misrepresented the amounts paid by the League for certain of the tires delivered to the plaintiff under the accounting contract of September 30, 1912, Bidwell tendered his resignation as president and director of the plaintiff and the same was duly accepted.

The agreement of September 30, 1912, recites that the agreement of December 6, 1911, provided, among other things, "for the exclusive services of the League in the sale of the first nine thousand five hundred (9,500) shares of the capital stock of the tire company, and for the services of the League in disposing of the output or product of the factory of the tire company," and that the League had, "or will shortly have," disposed of the amount of the capital stock of the plaintiff which it was authorized by said agreement to sell, and that the subscriptions had been turned over to the plaintiff and were in process of collection, and that the total of 10,000 shares of capital stock of the plaintiff "has been at this time substantially disposed of," and that the parties desired "to arrange for the continuance of the exclusive agency" provided for in the contract of December 6, 1911, "in the sale of at least seven thousand five hundred shares," and desired to provide for the compensation to be paid to the League for such services. The parties thereupon agreed, so far as material to this motion, that the League should act as agent for the plaintiff in selling its capital stock to the extent of 7,500 shares more on substantially the same terms as those embraced in the former contract, but with provisions regulating more definitely the obligations of the respective parties; but the provisions of the former contract with respect to the manufacture and sale of tires was "supplemented and amended" by a provision prescribing that the tires manufactured by the plaintiff should be adopted and

sold by the League as its official tires and should be sold by the plaintiff to the League "at such price as the League shall be able to purchase a tire of equal or better quality of any other manufacturer," and the plaintiff agreed to sell to the League at such prices the entire output of its factory not required to supply its own stockholders, and "to have all orders or requests for tires from its stockholders turned over to the League, to be filled as. its distributing agent," and to use its best endeavors to have its stockholders continue as members of the League, and it was provided that, if the League should not render efficient service in filling orders for tires, the plaintiff was to be at liberty "to fill such orders direct," and in the distribution of such tires to the said stockholders the cost of distribution by said League "shall be considered an item of the cost of manufacture, and shall be paid to the League from such cost price obtained from the stockholders."

It was further provided that the prices at which tires were to be furnished by the tire company to the League to meet "the demands of its members" should be fixed by mutual agreement, and that if the League should claim, as therein provided, that the prices so fixed were in excess of the price at which tires of equal quality could be obtained by the League in sufficient quantity, or if the plaintiff should claim that the prices were inadequate, and the parties should fail to agree upon a new schedule of prices as therein provided, the question should be arbitrated. It was further provided, in effect, that the output of the plaintiff's factory should be furnished to the League to the extent required to meet its demands, and that the surplus, if any, should not be sold, except to be resold by manufacturers as part of their product, for a price less than that paid by the League. It was mutually agreed that the League should be at liberty to buy and sell other makes of tires "under their respective names," and plaintiff agreed not to establish or maintain any sales agents for the distribution or sale of tires without the approval of the League while the contract remained in force, and the League agreed that it would not promote the organization "of other tire manufacturing companies during the continuance of this contract." The plaintiff also agreed that it would not create or form a league membership, association, or organization, or furnish its stockholders with automobile accessories other than tires. It is alleged that the parties did agree upon the prices at which the tires were to be furnished to the stockholders of the plaintiff and to the stockholders of the League.

The theory upon which the plaintiff seeks equitable relief is that it has not an adequate remedy at law, and the complaint and affidavits contain appropriate allegations to entitle the plaintiff to a temporary injunction on that theory. The complaint contains allegations tending to show that the defendants have violated these contracts in many respects, and particularly by making changes in the printed forms of subscriptions for plaintiff's stock by which the subscriptions were to be made payable to the order of the League, in misappropriating such subscriptions when received, in causing misrepresentations to be made in the use thereof and with respect to the relations between the plaintiff and the League, and in causing its agents to accept checks pay-

able to the order of the League in payment of subscriptions to the capital stock of the plaintiff, and by failing and refusing to adopt and sell tires manufactured by the plaintiff as the official tires of the League, and by promoting the organization of other corporations for the purpose of manufacturing tires and in not performing the functions which it was contemplated by the agreements for co-operation between the plaintiff and the League should be performed by the League, and in inducing, by false and fraudulent representations, stockholders of plaintiff to assign their certificates of stock to Bidwell or others in exchange for stock in other corporations the organization of which was promoted by said Bidwell and the defendant League, and in inducing plaintiff's stockholders to believe that they would obtain like and more advantageous privileges by so doing, and by failing to continue the sale of the capital stock of the plaintiff, and by failing and neglecting to advertise and send out announcements to promote the publicity and sale of the plaintiff's tires, and by failing to deliver to the plaintiff orders for its tires received by the League and by placing such orders elsewhere, and by failing to afford plaintiff access to the correspondence files of the League, and by falsely and fraudulently representing to the stockholders of the plaintiff and the League that orders for the plaintiff's tires must be placed through the League, and by representing to the stockholders of the League that the output of the plaintiff's factory is inadequate to supply their requirements.

The complaint contains numerous allegations charging the League and Bidwell with having made false and fraudulent representations with respect to the assets of the League and its ability to promote the organization of another corporation to manufacture tires and representing that the plant of the plaintiff was the plant of another corporation so formed, and calculated to mislead the public into thinking that relations with the plaintiff were continued; whereas the League was attempting to promote the interests of other corporations. It is further alleged in the complaint that the plaintiff established its plant and commenced to manufacture tires about April 1, 1913, and has a capacity for turning out upwards of 100 tires per day. It is also alleged that, on account of repeated violations by the League of its contract obligations with the plaintiff concerning the sale of the plaintiff's capital stock, "the plaintiff finally advised the League that on and after a date named the authority of said League to act as the agent of the plaintiff in such stock sales would be terminated and that further subscriptions taken after May 10, 1913, would not be received, and thereupon the said League discontinued all sales of the stock of the plaintiff and has in many other respects failed to carry out and perform the terms and conditions of said contract in respect thereto." Plaintiff evidently is apprehensive that the League and Bidwell and their business associates will obtain stock control of the plaintiff, but that is no basis for injunctive relief. The stockholders of the plaintiff are at liberty to dispose of their stock as they see fit. There are other allegations of the complaint which have no material bearing on the relief demanded.

The defendants League and O'Shea appeared in opposition to the motion, and their counsel read certain affidavits and the answer of the

League. Their position is, in substance, that prior to the commencement of the action the contract relations of the plaintiff and the League were terminated by notices from the League to the plaintiff of its election to terminate the contracts on account of alleged violations thereof by the plaintiff. The principal item of evidence relied upon in support of this contention is a letter from the plaintiff to the League under date of April 26, 1913, which was received by the League on or about that date. By that letter the plaintiff complained that the League was not acting in good faith in carrying out the provisions of the two contracts to which reference is first made in this opinion, and reference is made to negotiations theretofore had between the parties and their attorneys with a view to adjusting their differences. Reference is then made to the settlement contract of September 30th, and the League is charged with fraud in inducing the execution thereof, and the plaintiff gave notice that on account of such fraud it elected to abrogate that contract and would call the League to account for the matters which purported to be adjusted thereby. After reciting the plaintiff's grievances, the letter contains the following:

"This and almost innumerable other reasons require that this company advise you of the termination to-day of your agency for the sale of capital stock of this company and that, in view of your attitude, this company will look to you for damages for failure to perform the contract in various particulars.

"Owing to the distances at which some of the agents now engaged in stock sales operate, and in view of the fact that they should in fairness receive some notice of the termination of your agency and authority to sell the stock of this company, we will accept from you such subscriptions as are obtained from such of your agents as may be still operating up to May 10th next, and you will be allowed the contract commission on all of such subscriptions that may be turned in before said date. * * *

"Regretting that your actions and attitude have necessitated this termination of your agency, and that you thus lightly treat the obligations imposed by your contracts and your relation to this company. * * * "

By a letter under date of May 23, 1913, addressed to the League, the plaintiff reiterated, by express reference, its attitude with respect to the cancellation of the League's agency for selling its stock. Under date of June 3, 1913, the plaintiff addressed a letter to one of its stockholders, in answer to an inquiry made by him concerning the relations between the plaintiff and the League, saying, among other things:

"The rubber company has severed all relations with the League, and will not be responsible for any statements they may make or the character of the goods furnished by them. We will not sell to the International Automobile League any part of our product, nor can they make delivery of our tires to their members unless they get such tires without our knowledge. * * *

"We are not advertising and never have. At the present time, the stockholders are taking all our product.

"Later we will sell to dealers at the manufacturer's profit any surplus that we may have. We could not consider at the present writing any agency proposition in regard to selling our tires."

Theretofore and on April 19, 1913, the attorney for the League had addressed the attorney for the plaintiff in writing with respect to negotiations, evidently theretofore had verbally between them, saying, among other things:

"The rubber company is thoroughly convinced that there is no longer any alternative than for it to terminate the contract relations between the companies on account of the persistent breaches of contract and failures to perform on the part of the League.  *   *   *   Having arrived at this conclusion, but still anxious to obtain those benefits, with the least possible friction, we propose to allow the contract arrangements to continue and to waive the failure to perform, for which we now have a cause of action against the League, upon which I believe substantial damages may be recovered, if it may be agreed: (1) That the tire company may proceed at once to sell the $250,000.00 of stock not covered by the League's contract, upon the same terms and conditions as to prices and stockholders' privileges as apply to League stock sales, such sales by the rubber company to cease when the League has brought its stock sales back to the average monthly amount of the sales for the year ending June 1, 1912; (2) that tire depot agencies may be established at such points as the rubber company may select upon the general basis adopted and agreed upon for the Denver agency; (3) and that upon the execution in writing of such modifications or additional agreement that the League reimburse the tire company for the amounts due on account of the L. & M. and Michilin tire discrepancies, concerning which between ourselves, you and I have practically reached an agreement."

The letter indicates that the League had manifested a desire to have plaintiff postpone action terminating the contract, and it was asserted that the plaintiff was desirous that its stockholders might enjoy the advantages which it was sought by the contracts to secure; and reference is made to a suggestion made by the attorney for the League concerning a proposal made by the attorney for the plaintiff of terms for the cancellation of the contracts, and assurance was given that the plaintiff had no desire to embarrass the League and would prefer to have the provisions of the contract carried out in good faith, and it was asserted that the plaintiff has, "to a great extent, fulfilled the obligations which it assumed under the contracts and the League and Mr. Bidwell have received upwards of $335,000.00 on commissions under the stock sale agreement, and all of the benefits which the tire manufacturing scheme gave the League in membership and patronage," and that the League had failed to advertise the plaintiff's tires as the official tire of the League, and that the plaintiff intended to obtain the benefit secured by the contract in that regard, "or substantial damages in lieu thereof." Allusion is then made to the provision of the contract by which the League was to take over from the plaintiff certain property on the 1st of January, 1914, which, it asserted, must be carried out in accordance with the agreement, and the letter then continues as follows:

"If your client desires to terminate the contract and be relieved of all obligation thereunder, I am authorized to advise you that the same may be done upon this basis: (1) Reimbursement of the rubber company for the L. & M. damage suit upon the basis already offered you; (2) reimbursement for the Michilin discrepancy for the amount agreed, already adjusted; (3) payment of back taxes on No. 270 North Division street, and execution of a lease for the future, if desired; (4) indemnity against any judgment in the Anderson suit; (5) reimbursement of L. & M. tire discrepancy, amounting to $2,237.28; (6) all the obligations of the League, including contract to purchase North Division street property, adoption of official tire, advertising of product, etc., to be canceled; (7) the balance due under the September 30th contract to be extended until such time as all the commissions for stock sales shall be credited to the account, and if there is a balance due the tire company, the same to be paid within thirty days after adjustment. If commissions are due the League, payment to be made on the same basis.

"If the League desires to buy the products of the rubber company, an arrangement for such supply may be made upon a basis approximately ten (10) per cent. below the retail price of the rubber company.

"We are submitting the two propositions above stated with the idea of reaching an understanding and allowing Mr. Bidwell to follow which course he deems the most advantageous."

By letter under date of May 8th, the League through its attorney accepted the proposition contained in said letter of April 19th, and, although it is not expressly stated which proposition is accepted, it fairly appears by other provisions of the letter that the second proposition for terminating the contract relations between the parties was intended to be accepted. That letter also contained various suggestions with respect to carrying into effect the acceptance of the proposition. It appears that the adjustment was not made as contemplated; but the acceptance of the proposition was unconditional and would seem to constitute a binding contract. Considerable other correspondence between the parties was presented, and it appears that there were negotiations subsequent to the letters to which express reference has been made between the attorneys for the respective parties, the effect of which is not fully presented by the record now before the court. There is also evidence from which it is claimed that the continuance of the contracts in full force was subsequently recognized by both parties; but I do not think that it has been so shown. I therefore refrain from expressing an opinion on the merits as they may be developed on a further application or on the trial of the case by common law evidence. It is, however, incumbent upon the plaintiff in order to entitle it to a temporary injunction to establish a prima facie case for equitable relief by the final judgment of the court.

[1] I am of opinion that on the record now before the court it presumptively appears that the contracts, the violations of which the plaintiff seeks to restrain, have been terminated and are no longer binding on the defendants. It may be argued that it should not be held that it was within the power of Bidwell by resigning to terminate the contracts and deprive the plaintiff of the fruits thereof, and yet such is the contract of the parties if it be literally construed; but it is unnecessary to decide whether the continuation of the injunction should be denied on that ground alone, for the plaintiff elected, on account of alleged violations of the contract by the League, to cancel the selling agency of the League, which was a material provision of the contract, and the parties apparently agreed to terminate their contract relations by a settlement contract which apparently rested on a good consideration. In the absence of evidence by negotiations or otherwise of a withdrawal of such election or of a waiver on the part of the League to accept and regard the same as a cancellation of the entire contract, or of a recognition subsequently by both of the continuance of the contract, it must be held that plaintiff is not in a position to invoke the aid of a court of equity in enforcing the contracts. The other letters of the plaintiff to which reference has been made indicate that its action was deliberate, and they are not susceptible of the construction urged by the learned counsel for the plaintiff that the plaintiff merely

intended to suspend temporarily the right of the League to sell its stock on account of violations of the contract by the League.

[2] The plaintiff cannot, after terminating and canceling part of the contract, enforce in equity its remaining provisions. It presumptively appears that it has elected to stand upon its remedy at law for damages.

It follows, therefore, that the motion for the continuance of the injunction should be denied, but without prejudice to a renewal on further proof as indicated herein, and, inasmuch as it appears that both the League and O'Shea have violated the injunction, the denial of the motion is without costs.