JEFFREY ROBERT GLEITMAN, AN INFANT BY HIS GUARDIAN *AD LITEM*, IRWIN GLEITMAN AND SANDRA GLEITMAN, PLAINTIFFS-APPELLANTS, v. ROBERT COSGROVE, Jr. AND JEROME DOLAN, DEFENDANTS-RESPONDENTS.

Argued November 21, 1966—Decided March 6, 1967.

Mr. *Louis Santorf* argued the cause for appellants (*Mr. Leon A. Consales,* attorney).

Mr. *John W. Griggs* argued the cause for respondents (*Messrs. Morrison, Lloyd & Griggs,* attorneys).

The opinion of the court was delivered by

PROCTOR, J. This is a malpractice suit for money damages. The trial judge dismissed the complaint of the infant plaintiff at the close of plaintiffs' case, and dismissed the complaints of his father and mother after all the evidence was heard. The appeal was certified to this Court on its own motion pursuant to *R. R.* 1:10–1(a) prior to argument in the Appellate Division.

The first count of the complaint is on behalf of Jeffrey Gleitman, an infant, for his birth defects. The second count is by his mother, Sandra Gleitman, for the effects on her emotional state caused by her son's condition. And the third count is by his father, Irwin Gleitman, for the costs incurred in caring for Jeffrey. Defendants, Robert Cosgrove, Jr. and Jerome Dolan, are physicians specializing in obstetrics and gynecology engaged together in the practice of medicine in Jersey City.

Sandra Gleitman consulted defendants on April 20, 1959. She was examined by Dr. Robert Cosgrove, Jr. and found by him to be two months pregnant. She informed him that on or about March 20, 1959 she had had an illness diagnosed as German measles. Mrs. Gleitman testified that Dr. Cosgrove, on receipt of this information and on inquiry by her, told her that the German measles would have no effect at all on her child.

For the next three months Mrs. Gleitman received her prenatal medical care from the army doctors at Fort Gordon, Georgia where her husband was stationed. She informed the army doctors about the German measles she had had in her early pregnancy, and they instructed her to ask her regular physician about this when she returned home.

She next consulted defendants in July at which time she saw Dr. Dolan. Mrs. Gleitman testified that she repeated her inquiry about the effects of German measles and again received a reassuring answer. These inquiries and answers occurred on each of her subsequent monthly visits.

On November 25, 1959 Mrs. Gleitman was delivered of a boy, Jeffrey, at the Margaret Hague Maternity Hospital in Jersey City. Although at first the baby seemed normal, a few weeks later the substantial defects which Jeffrey has in sight, hearing, and speech began to become apparent. He has had several operations which have given him some visual capacity, and he attends a special correctional institute for blind and deaf children. His physical condition, which is seriously impaired, is not in dispute on this appeal.

Plaintiffs' medical expert, Dr. Louis Fraulo, gave his opinion that Jeffrey's condition was causally related to the viral disease of German measles which Mrs. Gleitman had in March. Dr. Fraulo testified that women who have German measles in the first trimester of their pregnancy will produce infants with birth defects in 20 to 50 per cent of the cases. Dr. Fraulo further stated that a physician who finds pregnancy and is given a history of German measles occurring during the term of pregnancy should inform his female patient of the likelihood of birth defects. In answer to a hypothetical question based on Mrs. Gleitman's testimony, Dr. Fraulo stated that defendants had deviated from generally accepted medical standards by not informing their pregnant patient of the likelihood of birth defects. A patient so informed, Dr. Fraulo testified, could then decide whether to bear the baby or have the pregnancy terminated by an abortion.

Dr. Robert Cosgrove, Jr. agreed that Mrs. Gleitman had consulted him for her pregnancy on April 20, 1959 and had thereafter been the patient of Dr. Dolan and himself until November 25, 1959 when Jeffrey was born. He further agreed that the history given him had included the illness of German measles in March, and acknowledged that his duty as a physician required him to inform his patient of the possibility of birth defects. He testified, however, that in the presence of Dr. Samuel Cosgrove, since deceased, and a woman who appeared to be the mother of Mrs. Gleitman, he told his patient of a 20 per cent chance her baby would have some defect. He

also stated that he informed her that some doctors would recommend and perform an abortion for this reason, but that he did not think it proper to destroy four healthy babies because the fifth one would have some defect.

Dr. Dolan testified that Mrs. Gleitman, whom he first saw in July when in any event it was too far along in the pregnancy for a medically safe abortion, had never asked him about the effects of German measles, and that he had never mentioned these effects to her. Dr. Dolan, as well as Dr. Edward C. Waters, who was called as an expert for defendants, agreed that a physician had the duty of informing his patient as to the likelihood of birth defects which they both estimated would occur in some 20 to 25 per cent of the cases where a female has German measles in the first trimester of her pregnancy.

The theory of plaintiffs' suit is that defendants negligently failed to inform Mrs. Gleitman, their patient, of the effects which German measles might have upon the infant then in gestation. Had the mother been so informed, plaintiffs assert, she might have obtained other medical advice with a view to the obtaining of an abortion. Plaintiffs do not assert that Mrs. Gleitman's life or health was in jeopardy during the term of her pregnancy.

As noted above the trial judge dismissed the three counts without submitting any of them to the jury. The claim of infant plaintiff was dismissed for failure to show that acts of the defendants were the proximate cause of Jeffrey's condition, and the claims by his mother and father were dismissed because the trial judge believed the suggested abortion would be criminal in New Jersey under *N. J. S.* 2A:87–1.

Because the complaint was dismissed on motion for judgment by defendants, the testimony on behalf of plaintiffs together with all reasonable inferences therefrom will be assumed to be true. The motion for judgment of dismissal concedes for purposes of the motion the truth of plaintiffs' evidence. *Melone v. Jersey Central Power & Light Co.,* 18 *N. J.* 163, 170 (1955). Specifically, on this appeal we must take it

to be the fact that Dr. Cosgrove, Jr. affirmatively misled Mrs. Gleitman on April 20, 1959 by telling her that the German measles she had in March would have no effect at all on her child then in gestation (despite the conflict in the evidence on this point).

For our discussion of this case we will assume that somehow or somewhere Mrs. Gleitman could have obtained an abortion that would not have subjected participants to criminal sanctions, and that she did not do so because she relied on the incorrect advice of the defendants.

At the outset it must be clearly understood that there is no suggestion by plaintiffs that defendants could have ordered any therapy—whether surgery, drugs or otherwise—which would have decreased the possibility that the infant then in gestation would be born with birth defects. The present case is sharply different from those cases where a deviation from standard medical practice affects the chances that an infant will be born with birth defects. In *Sylvia v. Gobeille, R. I., 220 A. 2d 222 (Sup. Ct. 1966)*, plaintiff alleged that defendant physician should have given her mother gamma globulin when the mother consulted him for German measles which she had while pregnant. It was alleged that this therapy would have decreased the likelihood that plaintiff would be born with physical defects. In the present case there is no allegation that gamma globulin or any other therapy might have helped.[1]

The right of an infant to sue for prenatal torts was established in this State by *Smith v. Brennan, 31 N. J. 353* (1960), where a child in gestation received injuries when his mother was in an automobile accident:

"The semantic argument whether an unborn child is 'a person in being' seems to us to be beside the point. There is no question that conception sets in motion biological processes which if undisturbed

[1] The only evidence in the case concerning gamma globulin was given by Drs. Cosgrove and Dolan and tended to show that gamma globulin is sometimes used as therapy at the time a pregnant woman is actually ill with German measles but not afterwards.

will produce what every one will concede to be a person in being. If in the meanwhile these processes can be disrupted resulting in harm to the child when born, it is immaterial whether before birth the child is considered a person in being. And regardless of analogies to other areas of the law, justice requires that the principle be recognized that a child has a legal right to begin life with a sound mind and body." *Id.*, 31 *N. J.*, at *p.* 364.

An essential part of the cause for action set forth in *Smith v. Brennan* is the "disruption" or proximate cause of injury by act of commission or omission which results in impairment to what otherwise would be a normal healthy child. In the present case there is no contention that anything the defendants could have done would have decreased the likelihood that the infant would be born with defects. The conduct of defendants was not the cause of infant plaintiff's condition.

The infant plaintiff is therefore required to say not that he should have been born without defects but that he should not have been born at all. In the language of tort law he says: but for the negligence of defendants, he would not have been born to suffer with an impaired body. In other words, he claims that the conduct of defendants prevented his mother from obtaining an abortion which would have terminated his existence, and that his very life is "wrongful."

■ The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies. As a recent commentator put the matter:

"[N]o comparison is possible since were it not for the act of birth the infant would not exist. By his cause of action, the plaintiff cuts from under himself the ground upon which he needs to rely in order to prove his damage." Tedeschi, "On Tort Liability for 'Wrongful Life'," 1 *Israel L. Rev.* 513, 529 (1966).

The two cases from other states which have considered the theory of action for "wrongful life" were brought by illegitimate children for damages caused by their birth out of wedlock, and in both cases policy reasons were found to deny recovery. *Zepeda v. Zepeda,* 41 *Ill. App.* 2d 240, 190 *N. E.* 2d 849 (*App. Ct.* 1963), *cert. denied* 379 *U. S.* 945, 85 *S. Ct.* 444, 13 *L. Ed.* 2d 545 (1964), and *Williams v. State of New York,* 18 *N. Y.* 2d 481, 276 *N. Y. S.* 2d 885, 223 *N. E.* 2d 343 (*Ct. App.* 1966).

We hold that the first count of the complaint on behalf of Jeffrey Gleitman is not actionable because the conduct complained of, even if true, does not give rise to damages cognizable at law.

The mother and father stand in a somewhat different position from the infant. They are equally subject to the factual circumstance that no act by the defendants could have decreased the likelihood that the infant would be defective. However, Mrs. Gleitman can say that an abortion would have freed her of the emotional problems caused by the raising of a child with birth defects; and Mr. Gleitman can assert that it would have been less expensive for him to abort rather than raise the child.

A considerable problem is raised by the claim of injury to the parents. In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. When the parents say their child should not have been born, they make it impossible

for a court to measure their damages in being the mother and father of a defective child.

Denial of the claim for damages by adult plaintiffs is also required by a close look at exactly what it is they are here seeking. The thrust of their complaint is that they were denied the opportunity to terminate the life of their child while he was an embryo. Even under our assumption that an abortion could have been obtained without making its participants liable to criminal sanctions, substantial policy reasons prevent this Court from allowing tort damages for the denial of the opportunity to take an embryonic life.

It is basic to the human condition to seek life and hold on to it however heavily burdened. If Jeffrey could have been asked as to whether his life should be snuffed out before his full term of gestation could run its course, our felt intuition of human nature tells us he would almost surely choose life with defects as against no life at all. "For the living there is hope, but for the dead there is none." Theocritus. See Ryan (M. D.), "Humane Abortion Laws and the Health Needs of Society," 17 *West. Res. L. Rev.* 424, 428–430 (1965); and for a recent statement on "the rights of the fetus" see Conniff, "The World of the Unborn," *The New York Times,* January 8, 1967, § 6 (Magazine), *pp.* 97–98.

The right to life is inalienable in our society. A court cannot say what defects should prevent an embryo from being allowed life such that denial of the opportunity to terminate the existence of a defective child in embryo can support a cause for action. Examples of famous persons who have had great achievement despite physical defects come readily to mind, and many of us can think of examples close to home. A child need not be perfect to have a worthwhile life.

We are not faced here with the necessity of balancing the mother's life against that of her child. The sanctity of the single human life is the decisive factor in this suit in tort. Eugenic considerations are not controlling. We are not talking here about the breeding of prize cattle. It may have been

easier for the mother and less expensive for the father to have terminated the life of their child while he was an embryo, but these alleged detriments cannot stand against the preciousness of the single human life to support a remedy in tort. *Cf.* Jonathan Swift, "A Modest Proposal" in *Gulliver's Travels and Other Writings,* 488–496 (*Modern Library ed.* 1958).

 Though we sympathize with the unfortunate situation in which these parents find themselves, we firmly believe the right of their child to live is greater than and precludes their right not to endure emotional and financial injury. We hold therefore that the second and third counts of the complaint are not actionable because the conduct complained of, even if true, does not give rise to damages cognizable at law; and even if such alleged damages were cognizable, a claim for them would be precluded by the countervailing public policy supporting the preciousness of human life.

In the view we have taken of the case we need not consider whether the abortion which plaintiffs were denied the opportunity to obtain would have been illegal. Our statute provides criminal sanctions for abortions which are performed "without lawful justification." *N. J. S.* 2A:87–1 and see *N. J. S.* 2A:170–76. The only justification so far held lawful by our courts is preservation of the mother's life. *State v. Shapiro,* 89 *N. J. L.* 319 (*E. & A.* 1916) ; *State v. Brandenburg,* 137 *N. J. L.* 124 (*Sup. Ct.* 1948). It may well be that when a physician performs an abortion because of a good faith determination in accordance with accepted medical standards that an abortion is medically indicated, the physician has acted with lawful justification within the meaning of our statute and has not committed a crime. See § 207.11 *Model Penal Code,* comment 4, 153–154 (*Tent. Draft No.* 9 1959), and *cf. Sanitary Vendors, Inc. v. Byrne,* 40 *N. J.* 157 (1963).

For the foregoing reasons the judgment of the trial court dismissing the three counts of the complaint is affirmed.

FRANCIS, J. (concurring). I concur in the opinion of Justice Proctor, except that I prefer to deal more specifically with the problem of criminality of a eugenic abortion of the type involved in this case.

It may be noted that the dismissal of the suit as to the adult plaintiffs in the trial court did not take place at the close of the plaintiffs' proof. The factual defense was presented, and thereafter defendants' motion to dismiss was granted. Thus on one side of the controversy we have Mrs. Gleitman's assertion (1) that she told Dr. Cosgrove of her experience with German measles (rubella) when she first consulted him about her pregnancy, (2) that she inquired of Dr. Cosgrove on that occasion and thereafter whether her child would be defective as a result of the disease, and (3) that he and later Dr. Dolan assured her there was nothing to be concerned about, the child would not be affected. On the other side, we have Dr. Cosgrove's testimony that when Mrs. Gleitman informed him of the rubella, he advised her that the incidence of damage to babies of mothers who had the disease in the early stages of their pregnancy was about 20%. He said also that he told her there were places where abortions were performed for that reason, but that he did not consider it proper to handle obstetrics cases in that way; he did not think that in order to eliminate one baby who might be deformed, the destruction of four more babies who might be perfectly normal was "a very reasonable way to conduct the practice of medicine." Not only did he make it plain that he would not do such an abortion, but he also testified that in his view the operation would be criminal in New Jersey and in every other state as well.

On this appeal, as Justice Proctor pointed out, the issue of credibility between Mrs. Gleitman and the doctors is not before us. The defense version of the affair is mentioned primarily because of its bearing on another aspect of the case to be discussed hereafter. The narrow question presented to this Court for decision is: assuming the truth of Mrs. Gleitman's testimony, does the law recognize a cause of action against a

doctor who fails to tell a pregnant wife who has had rubella in the first trimester of her pregnancy that her child may be defective, and who fails to tell her she may elect to have an abortion performed by him under proper auspices or, if he will not do so, by another physician who is not opposed to the operation, or in some other state or country where such operations are sanctioned. If there is such a legally cognizable claim against the doctor, then the trial court's judgment must be reversed and the case remanded for trial by a jury which will resolve the matter of credibility between the disputants.

I

Under the existing statute, *N. J. S.* 2A:87–1, it is a crime to commit an abortion "without lawful justification." Plaintiff Mrs. Gleitman contends that contraction of German measles during the first trimester of her pregnancy constituted lawful justification for the destruction of her child in this State by a New Jersey doctor. She claims further that even if this type abortion is criminal in this State, it was malpractice for Doctors Cosgrove and Dolan not to advise her that as a result of the rubella her child might be defective and that in such cases it is or may be possible in some states or countries to obtain an abortion. Resolution of these problems requires a study of the background of our abortion law.

The *statutory* crime of abortion had its origin in 1849. See *L.* 1849, *p.* 266, which became effective on March 1, 1849. The act said:

"That if any person or persons, maliciously or without lawful justification, with intent to cause and procure the miscarriage of a woman then pregnant with child, shall administer to her, prescribe for her, or advise or direct her to take or swallow any poison, drug, medicine, or noxious thing; and if any person or persons maliciously, and without lawful justification, shall use any instrument, or means whatever, with the like intent * * * shall, on conviction thereof. be adjudged guilty of a high misdemeanor; and if the woman die in consequence thereof, shall be punishable by fine, not exceeding one thousand dollars, or imprisonment at hard labour for any term not exceeding fifteen years, or both; and if the woman doth not die in consequence thereof, such offender shall, on conviction thereof, be adjudged guilty of a misde-

meanor, and be punished by fine, not exceeding five hundred dollars, or imprisonment at hard labour, for any term not exceeding seven years, or both."

The impetus for the legislative action is interesting and significant. Abortion was a crime at common law, but guilt was subject to certain exceptions. During 1848 or early 1849 one Cooper was indicted for abortion. The Supreme Court quashed the indictment because under the common law the crime was not present unless the child was quick within the mother's womb when the abortion was committed. The court said the offense was against the life of the child, and in contemplation of law life commenced "at the moment of quickening, at that moment when the embryo gives the first physical proof of life." [1] Since there was no quickening, there was no life to be destroyed and consequently the defendant could not be convicted. The Chief Justice, who wrote the opinion, suggested that if the good of society required elimination of the evil of prequickening abortion he supposed it was "far better than it should be done by legislative enactments" rather than by judicial extension of the common law penal code. And he said the court deemed it "unwise upon this subject to occupy debatable ground." *State v. Cooper, 22 N. J. L. 52 (Sup. Ct.* 1849).[2]

---

[1] 14–20 weeks. See *Annotation*, § 207.11, *Tentative Draft, Model Penal Code* (1959) 148.

[2] The unwillingness of the New Jersey court to change the common law abortion rule also reflected the attitude of other jurisdictions. For example, in *Mitchell v. Commonwealth,* 78 *Ky.* 204, 39 *Am. Rep.* 227 (*Ct. App.* 1879), where the issue was the same as in *Cooper*, the Supreme Court said:

"In the interest of good morals and for the preservation of society, the law should punish abortions and miscarriages, willfully produced, at any time during the period of gestation. That the child shall be considered in existence from the moment of conception for the protection of its rights of property, and yet not in existence until four or five months after the inception of its being, to the extent that it is a crime to destroy it, presents an anomaly in the law that ought to be provided against by the law-making department of the government. The *limit* of *our duty is to determine what the law is,* and *not to enact or declare it as it should be."* (Emphasis added)

The response of the Legislature, once it foresaw the result in *Cooper,* was galvanic. The statute quoted above was enacted even before the court announced its decision. The requirement for quickening of the fetus as an indispensable element of the crime was eliminated. Causing "the miscarriage of a woman then pregnant with child * * * without lawful justification" was established as the criminal offense. In 1872 a change was made in the act. The original statute declared that if the woman died as the consequence of the abortion, one penalty would follow; if she did not die, a lesser penalty was specified. The 1872 supplement provided for a certain penalty if the woman *or child* died; and a lesser one if neither died. Since that time there has been no change of substance in the description of the offense. The 1952 revision of the Crimes Act, which put the statute in its present more concise form, eliminated only a redundancy in the description of the crime. Whereas the earlier laws spoke of causing or procuring the miscarriage of "a woman then pregnant with child," the revision put the crime in terms of causing or procuring "the miscarriage of a pregnant woman." *N. J. S.* 2A:87–1. However, the revision continued in force the provision for more severe punishment if the "woman or child shall die" as a consequence of the abortion.

The 1849 act and the subsequent legislative treatment reveal an unquestionable intention to enlarge the scope of the common law crime of abortion. An equally obvious purpose was to enlarge the protection offered by the common law so as to include the embryo or fetus *en ventre sa mere.* The references to "pregnant with child" and to the more severe penalties if the mother or child died from an abortion have deep significance. Obviously the pregnancy contemplated by the Legislature was the condition which begins at the moment of conception and terminates with delivery of the child. *State v. Loomis,* 90 *N. J. L.* 216 (*E. & A.* 1916). The lawmakers were saying as a matter of public policy that the moment the womb becomes instinct with embryonic life, it

should be unlawful to interrupt the ordinary development of that life "without lawful justification" (of which more later). In my judgment, the most important consequence of the statute is the legislative recognition and sequential incorporation in the law of the principle that the child as a legal entity begins at conception; as of that time it has a legal existence as a separate entity, as distinguished from a mere part of its mother's body. Distinctions based upon physical status during gestation such as embryo, fetus and viability lost their earlier impact on the crime of abortion. It was not until relatively recent years that the judiciary became aware of the full portent of the legislation.

The former Supreme Court in *Cooper* commented that for many purposes in the law of property and inheritance, the child *in utero* had been considered in being. But the Court felt itself bound by the common law precedent requiring the fetus to be quick before it could be considered legally in being for administration of the criminal law of abortion. The immediate response of the Legislature in 1849 to the circumstances of *Cooper* makes plain its design that the law should accept the child as in being from the instant of conception. Seven years ago our Court by unanimous vote gave full recognition to the principle that the unborn child at all stages of its gestative life is a legally existing entity. *Smith v. Brennan*, 31 *N. J.* 353 (1960).[3]

Rather extensive research satisfies me that at common law the only defense to an indictment for abortion was that destruction of the fetus was reasonably believed by the operat-

---

[3] Justice Proctor's opinion for the Court pointed out that medical authorities, which he cited, recognize that before birth an infant is a distinct entity; that the criminal law regards him as such, as well as does the law of property and decedents' estates for purposes beneficial to his interests. 31 *N. J.*, at *pp*. 363–367. It was noted 30 years ago that the increase in knowledge of embryology had revealed that the child has separate existence from the moment of conception. See Note, "A Functional Study of Existing Abortion Laws," 35 *Colum. L. Rev.* 87, *fn*. 2, *p*. 88 (1935).

ing physician to be necessary to preserve the mother's life.[4] Although there is no New Jersey case expressly stating this rule, Chief Justice Case speaking for the former Supreme Court in *State v. Brandenburg,* 137 *N. J. L.* 124, 126–127 (1948), in sustaining an abortion conviction rejected the contention that the following jury charge was erroneous:

"Lawful justification is used in the sense of necessity. It is a defense that the destruction of the child's life was necessary to save that of the mother, but it should be remembered that necessity of this class must be strictly limited. The right can only be exercised in extremity."

The Court found it "unnecessary to consider whether under our statute and the construction thereof given by our courts threatened impairment of a woman's health, as distinguished from the saving of her life, constitutes lawful justification."

Weighty corroboration for the view that the only defense at common law to the charge of causing an abortion was that it was done to save the life of the mother is to be found historically in the action taken by legislatures throughout the country. Since the early 1800's 46 states have adopted statutes making abortions criminal unless performed to save the mother's life. Seven states added, as another justification, aborting to save the life of the child. A few states and the District of Columbia sanction as a defense that the abortion was necessary to preserve the health of the mother or to pre-

---

[4] See, *Clark & Marshall on Crimes* (6th ed. 1958) § 11.06 *pp.* 685–689; *Perkins, Criminal Law* (1957) 101, 106; 3 *Burdick, Law of Crimes* (1946) § 871, *p.* 287; *Miller, Criminal Law* (1934) 443–444; *Clark's Criminal Law* (3d ed. 1915) 430–431; *Annotation, Tentative Draft, Model Penal Code, supra, p.* 152; Note, "A Functional Study of Existing Abortion Laws," 35 *Colum. L. Rev., supra,* at *p.* 95, *fn.* 53; see the much cited case of *Rex v. Bourne* [1938] 3 *All. E. R.* 615 *(K. B.)* where the trial court charging the jury said that if the doctor did not perform the abortion "in good faith for the purpose only of preserving the life of the girl," the verdict should be guilty. He said also that the words "in good faith for the purpose only of preserving the life of" the woman "express what, in my view, has always been the law with regard to the procuring of an abortion, and, although not expressed in sect. 58 of the Act of 1861, they are implied by the word 'unlawful' in that section."

vent serious and permanent bodily injury. Four states, including New Jersey, provide no specific exception to the general prohibition against abortion. *Annotation, Tentative Draft, Model Penal Code, supra,* at *pp.* 152–153; George,, "Current Abortion Laws: Proposals and Movements for Reform," 17 *W. Res. L. Rev.* 371, 375–376 (1965). These four speak in terms of "unlawful" abortion, "unlawfully" performing acts intended to cause abortion, and in New Jersey, as set forth earlier, the prohibition is against committing the abortion "without lawful justification."

In an area of the criminal law such as an abortion statute, which is so intimately related to public policy, ethics and morals, the nature of the offense prohibited depends strictly upon the language employed by the Legislature. And the intention conveyed and intended to be conveyed by the language must be determined in the ambiance of the time of its use, here 1849. At that time the only defense acceptable to the common law was that the abortion was performed to save the life of the mother. To me, therefore, it is inescapable that when the Legislature incorporated the words "without lawful justification" in its description of the crime, the justification intended was the only one then recognized, *i. e.,* to save the life of the mother. See *Perkins, Criminal Law, supra, pp.* 106–107. Moreover, the exception in its precise terms remained unchanged through the 1872 supplement and the 1898 and 1952 revisions of the Crimes Act. Also, it should be recalled that in *State v. Brandenburg, supra,* which was decided in 1948, the Supreme Court declined to hold or to give any indication that an abortion performed not to save the life of the mother, but for some reason pertaining to her health, would be within the statutory excuse. And, although not of overwhelming import, it is of some significance that after *Brandenburg* the Legislature did not in the ensuing years, particularly in the 1952 revision, enlarge the long-standing meaning of "without lawful justification."

It is a cardinal principle of statutory construction that the enactment under consideration must be viewed and inter-

preted in the light of the contemporary scene at the time the Legislature acted. No one, even the most sincere advocate of enlargement of the perimeter of justifiable cause for abortion, would suggest that the 1849, 1872 or 1952 Legislatures had in mind sanctioning eugenic abortions. The tenet referred to finds generally accepted expression in 50 *Am. Jur. Statutes,* § 236 (1944, *Supp.* 1966) to the effect that there is a tendency to construe the language of a statute in the light in which it may appear to a particular judge when his construction is to be given. But

"\* \* \* such an approach to the question is erroneous. Since, in determining the terms of a statute, the aim is to discover the connotation which the legislature attached to the words, phrases, and clauses employed, the words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted, and the statute must be construed as it was intended to be understood when it was passed."

This statement accords with the long-standing sentiment of the New Jersey courts. For example, the former Court of Errors and Appeals in *Crater v. County of Somerset,* 123 *N. J. L.* 407, 413 (1939), said:

"It suffices to add that we are under a duty to refer to the history of the times 'to ascertain the reason for, and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative, at the time of enactment. And the unmistakable evidence of such contemporaneous circumstances of the intention of the legislature should govern the construction of a statute whose terms are left doubtful by its language, and whose object is the correction of an abuse.' "

See also, *Magierowski v. Buckley,* 39 *N. J. Super.* 534, 553–554 (*App. Div.* 1956); and especially *Carlo v. Okonite-Callender Cable Co.,* 3 *N. J.* 253, 265 (1949), where this Court said:

"It is well established \* \* \* that statutes are to be construed with reference to the common law and that a statute which is claimed to

impose a duty or establish a right [or a justification] which was not recognized by the common law will be strictly interpreted to avoid such asserted change. To effectuate any change in the common law the legislative intent to do so must be clearly and plainly expressed." (Bracketed words added)

The sum of all the above is that in my judgment the "without lawful justification" exception applies only when the death of the mother can be reasonably anticipated to result from natural causes unless the child is destroyed. Additionally it means that I do not believe judges have a roving commission to pour into an exception in a penal statute volatile content which is plainly at odds with the original legislative intention, because of personal beliefs that eugenic considerations ought to provide justifiable cause for abortion. Our duty in this highly charged public policy area is to say what the law is and not what we think it ought to be. What it ought to be is a matter for the legislative branch of the government, and we must assume that branch will be conscientiously responsive to the requirements of public health and welfare, and the social and economic exigencies of the times. If it is not as responsive as the people believe contemporary life demands, the remedy rests with them and not with the courts.

No one claims an abortion was necessary to save Mrs. Gleitman's life. In fact the uncontradicted testimony is to the contrary. Thus, destruction of the fetus because of the previous rubella would have been a crime, as Dr. Cosgrove conceived it to be. Furthermore, it would have been a crime in all of our sister states where preservation of the life of the mother is the only warrant for an induced miscarriage. And even if Dr. Cosgrove, believing in good faith that such an interruption of pregnancy was lawful, had performed the operation or arranged for some other New Jersey doctor to do so, he would have been guilty of the criminal offense. *Cf. Adams v. State,* 200 *Md.* 133, 88 *A. 2d* 556 (*Ct. App.* 1952) ; *State v. Ellrich,* 10 *N. J.* 146 (1952).

## II

In seeking some support for the argument that the 1849 Legislature intended "lawful justification" for an abortion to include preservation of the health of the mother as well as her life, reference is made to *State v. Murphy,* 27 *N. J. L.* 112, 114–115, where in 1858, nine years after adoption of the statute, the Supreme Court said:

"* * * The design of the statute was not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts."

If the court meant to suggest that the only purpose of the 1849 act was to protect the life and health of the mother, I disagree. There is nothing in the legislative language to support that idea. It seems to me there were two objectives, of at least equal importance. One was to provide greater protection for the child *in utero* than was given under the common law. To accomplish this, the safeguard against abortion was moved backward from the time when the child became quick, to the moment of conception. Important *sequelae* have flowed directly or indirectly from this change, the most recent of which may be found in the *Smith v. Brennan* view of this Court that the unborn child exists as a legal entity from the moment of conception. The second objective was to furnish additional protection for the life and health of the mother by establishing the criminal liability for the abortionist as of the beginning of the pregnancy. This broader view of the aim of the 1849 law seems to have been the opinion of this Court in *State v. Siciliano,* 21 *N. J.* 249, 258 (1956), and *In re Vince,* 2 *N. J.* 443 (1949).

Whatever the merit of the statement in *State v. Murphy,* it supplies no basis for plaintiffs' claim that "lawful justification" for an abortion was intended by the 1849 act to include preservation of the health of the mother as well as to save her life. It is perfectly clear that the *Murphy* court in referring to the purpose of the statute, in making abortion a

crime if committed at any time during the period of gestation, as being to protect the life and health of the mother, was talking about safeguarding the mother *from the possible dangerous consequences of an abortion.* It was not intimating a view that the statute was intended to protect her *from the consequences of her pregnancy* beyond the safeguard provided by the common law, *i. e.,* if her life came into danger from the pregnancy she could be aborted without criminal liability for the abortionist. There is no inconsistency between these ideas or purposes. The statute recognized the dangers to life and health associated with abortion attempts, and in the public interest made such attempts, successful or otherwise, criminal. But, it accepted also the sensible common law attitude that occasionally, when a condition arising out of the pregnancy puts the mother's life in danger, the individual interest in safeguarding life must be regarded as paramount and the public policy against abortion subordinate. In this event the bar against abortion vanishes.

At times the line of demarcation between danger to life and danger to health from the pregnancy may be a shadowy one. In such case the honest expertise of the medical profession must be relied upon, and where the credibility of the operating physician is in issue, the decision as to whether he reasonably believed the woman's life was in danger ordinarily will be left to the jury. In this connection the Iowa Supreme Court said, "It [is] not essential that the peril to life should be imminent. It [is] enough that it be potentially present, even though its full development might be delayed to a greater or less extent. Nor [is] it essential that the doctor should believe that the death of the patient would be otherwise certain in order to justify him in affording present relief." *State v. Dunklebarger,* 206 *Iowa* 971, 221 *N. W.* 592, 596 (1928). Compare *Rex v. Bourne, supra,* which should not be regarded as a very worthwhile precedent. Both court and physician subverted the phrase "solely for the protection of the life of the woman" to serve the sympathetic expediency of the case. Quay, "Justifiable Abortion—Medical and Legal

Foundations," 49 *Geo. L. J.* 395 (1961) ; and *cf. State v. Gunther,* 169 *S. W.* 2d 404 (*Mo. Sup. Ct.* 1943) ; *State v. Rudman,* 126 *Me.* 177, 136 *A.* 817 (*Sup. Jud. Ct.* 1927) ; *Hatchard v. State,* 79 *Wis.* 357, 48 *N. W.* 380 (*Sup. Ct.* 1891) ; *Commonwealth v. Wheeler,* 315 *Mass.* 394, 53 *N. E.* 2d 4 (*Sup. Jud. Ct.* 1944).

Suppose we assume for purposes of the present case that "lawful justification" for destroying the child includes danger to the mother's health from the pregnancy—is plaintiffs' alleged cause of action in any better position? The uncontradicted medical proof is that Mrs. Gleitman enjoyed good health through the full period of her pregnancy and the delivery of the child. Doctors Cosgrove and Dolan testified that she had a normal and uneventful period of gestation and delivery. Neither she nor any doctor testified to the existence of any adverse health condition which would justify the therapy of an abortion. Consequently, even if serious danger to the mother's health from the pregnancy itself or from the effect of the pregnancy prior to a full term delivery or some other physical or mental disability were to be regarded as within the statutory justification, the thesis would not be applicable here. And no case so holding has been furnished to us from any one of the few of our sister states whose statutes accept serious health problems of the mother as a basis for abortion. Even in Massachusetts, where judicial construction has excluded from the "unlawful" category an abortion necessary to save a woman "from great peril to her life or health" (*Commonwealth v. Brunelle,* 341 *Mass.* 675, 171 *N. E.* 2d 850 (1961)), no decision indicates that the circumstances present here would justify the operation.[5]

---

[5] The section of the proposed Model Penal Code abortion statute which seeks to establish certain considerations of health as an excuse for abortion, if adopted, would not assist plaintiffs here. It seeks to justify abortion if continuance of the pregnancy would, in the opinion of the physicians, entail "a substantial risk of gravely impairing the mother's physical or mental health." *Proposed Official Draft, Model Penal Code, section* 230.3, *subsection* (2) (1962). No such risk is supportable under the testimony in this case.

During the trial and on this appeal plaintiffs refer to the operation, which they say Mrs. Gleitman was entitled to have, as a "therapeutic" abortion. Obviously that is a misnomer. A therapeutic abortion is an induced interruption of a pregnancy, the continuance of which will jeopardize the life or health of the mother. *Schmidt's Attorney's Dictionary of Medicine* (*Matthew Bender & Co., Inc.,* 1965) 1966 *Supplement p.* 159; *Maloy, Medical Dictionary for Lawyers* (*2d ed.* 1951. *Callaghan & Co.*) *p.* 5; *Application of Grand Jury of County of Kings,* 286 *App. Div.* 270, 143 *N. Y. S. 2d* 501 (*App. Div.* 1955).

A termination of pregnancy of the type involved in this case is described properly in the Chief Justice's dissent as a eugenic abortion. Eugenics is the science which addresses itself to improving the stock, whether human or animal; to means and methods of improving the physical and mental qualities of future generations by control of mating and reproduction. *Schmidt's, supra, p.* 284. In the context of a case like the present one, a eugenic abortion would be one based on the probability or possibility that the fetus may be born in a mentally or physically abnormal condition. No American statute authorizes such an abortion. *George, Current Abortion Laws: Proposals and Movements for Reform, supra, p.* 394. Thus it is criminal not only in New Jersey but in all of our sister states as well. Certain it is that no judicial decision has been found in this country which accepted a eugenic abortion for rubella as a defense to a criminal indictment.

In addition to the reasons already expressed for my belief that a eugenic abortion in cases of rubella is not founded in justifiable cause within the contemplation of our statute, some further explanation of the basis for my conviction that resolution of the issue should be left to the Legislature seems called for.

The effect of rubella contracted in the first trimester of a woman's pregnancy as the cause of mental or physical abnormality in the child is spoken of as if it were horrendous in

degree and virtually certain in all cases. But this is not so. According to varying statements in the record, the incidence of defective children ranges from 10% to 50%, in early pregnancy rubella cases. Referring to a 1963 article entitled *"Infectious Diseases During Pregnancy"* which was produced while he was on the witness stand, Dr. Cosgrove said he agreed with the statement therein that most authorities "report anomalies in only ten to twenty per cent of infants whose mothers are infected during the first trimester." It seems to be undisputed generally in the medical profession that presently there is no way of telling in advance of delivery whether such a child will be defective or the extent of any defect. In any given case there appears to be no certainty, only a variable statistic. Also, in "Humane Abortion Laws and the Health Needs of Society" by Dr. Kenneth J. Ryan, Professor of Obstetrics and Gynecology at the School of Medicine of Western Reserve University, 17 *W. Res. L. Rev.* 424, 428–429 (1965), it is noted that "In a careful prospective study which followed the 227 infants of mothers who contracted rubella during pregnancy, the incidence of mental retardation was no different than in the general population; ninety-two per cent of the children were attending regular schools eight to eleven years after birth. Many of the defects of these children were correctible." But the proponents of eugenic abortions in first trimester rubella cases advocate destruction of every fetus to serve the variable statistics.

Moreover, congenital defects from rubella run a broad spectrum. It is certain the children are not all as disabled as the unfortunate Gleitman boy. For example, blindness may be partial or total; it may be unilateral or bilateral. In many cases the degree of impairment may be different between the two eyes, and in some, one eye may be perfectly normal while the other is impaired. See, Roy & Deutsch, "The Congenital Rubella Syndrome—Ocular Pathogenesis and Related Embryology," 62 *Am. J. Ophthal.* 236, 238 (1966). The same imbalance may occur in hearing impairment. "Rubella Virus and the Human Foetus," 1965 *Brit. Med. J.* 1014, 1015; see

also, Sheridan, Final Report of a Prospective Study of Children Whose Mothers had Rubella in Early Pregnancy," 1964 *Brit. Med. J.* 536, 537–538. It might well be noted here also that in Dr. Ryan's article, *supra,* at *page 429,* he points out that "In this country's rubella epidemic of 1964–1965, many women were aborted with and without good evidence of risk, since other viral infections often masquerade as clinical rubella." Yet the eugenic abortion advocates would destroy every fetus when associated with an early pregnancy rubella. But the proposed Model Penal Code suggests only that an abortion be authorized when there is substantial risk that "continuance of the pregnancy" would mean that "the child would be born with *grave* physical or *mental* defect." *Section* 230.3 (2). (Emphasis added.)

There are doctors who feel that abortion in rubella cases represents a negative approach. They hold the view that their profession is devoted to the preservation of life, not to its destruction; that the major efforts in this field should be based on research and pointed toward prevention, not destruction. In the article in *The New York Times,* Conniff, "The World of the Unborn," referred to by Justice Proctor, it is said that "one line of research—already far advanced toward success—seeks a vaccine for the mother against German measles (or rubella)," *p. 96.*

There are many conditions and diseases of the mother which result in defective children. At one time tuberculosis was called "the most significant indication for therapeutic abortion in point of frequency" but abortion for that reason is practically nonexistent today. See, Dr. Kenneth R. Niswander, Associate Professor of Obstetrics and Gynecology at the State University of New York, "Medical Abortion Practices in the United States," 17 *W. Res. L. Rev.* 403, 416 (1965). The doctor noted "of the abortions in a recent Buffalo study, tuberculosis accounted for 33 to 50 per cent of the abortions in the 1940's, about 10 per cent in the 1950's, and none during the years 1958 to 1965." The advent of drug therapy produced this change. *Id.,* at *p.* 409. Cardiovascular

disease in pregnant women was treated frequently in the past as a proper basis for therapeutic abortion. But "with improved prenatal care (including the significant advances recently provided by cardiac surgery), the number of women with cardiovascular disease whose life is actually in danger during pregnancy has decreased substantially." Dr. Niswander, *supra,* at *page* 407. In the Buffalo study referred to above, "cardiovascular indications were present in about 15 per cent of the pregnancy interruptions in the 1940's; the incidence had decreased to approximately 5 per cent in the 1950's and became practically non-existent in the 1960's." *Id.,* at *page* 416. I have no doubt that other instances of this kind can be found. According to Dr. Niswander, "Taussig, in his volume published in 1936, lists a myriad of medical indications for abortion. Since the publication of [his] book, there has been a gradual transition in medical thinking, and some of the diseases formerly used as indications for abortion no longer obtain." *Id.,* at *page* 416, citing *Taussig, Abortion, Spontaneous and Induced: Medical and Social Aspects* (1936). See also the references in *The World of the Unborn, supra, pp.* 96–100, to the success of fetologists in treating the fetus *in utero* and guarding against some birth defects thereby. As the author hopefully puts it:

"People at work on the frontiers of obstetrics forsee, by all these means, not just an end to birth defects, but actual enhancement of intelligence and improvement of the bodily organs by 'genetic engineering.' " *Id.,* at *page* 100.

In referring to some of the medical aspects of the problem here, I do not pretend to any professional knowledge, certainly not to any expertise. And lacking capacity to evaluate the statements in the various articles mentioned, I do not offer them as gospel. I suspect there are few judges here or elsewhere in the country who are qualified to speak authoritatively on the medical phases of the problem. But the limited judicial knowledge and the lack of assistance given

us by the actual record submitted are the very reasons why broadening of the scope of legally permissible abortions should be left in the hands of those who promulgated the statute, *i. e.,* the Legislature. I am as certain as any human can be that the legislators never intended to authorize abortion simply because of rubella occurring in the first trimester of a woman's pregnancy. If abortion of that type is to be regarded as supported by justifiable cause, those public policy-makers who created the criminal offense should be regarded by the courts as having the primary right to say so. A Legislature is much better equipped to reach an informed judgment on such a controversial and emotional matter. It can study the problem by means of a committee of its own, which would seek information and advice from experts in obstetrics, gynecology and fetology. Predilections of judges in such a sensitive policy-making area of the criminal law are no substitute for educated judgment.

Under all the circumstances of this case, in my judgment it would have been a crime for Doctor Cosgrove or Dolan or any other New Jersey physician to abort the normal pregnancy of Mrs. Gleitman because she had had rubella in the first trimester of her pregnancy. Consequently, the defendants did not violate any legal duty which would make them liable in damages to her or her husband or their child, even if they failed to advise her of the possibility that her child might be defective, and that there were places where she could have an abortion performed, if she elected to do so.

Furthermore, as I suggested above, no such abortion has ever been sanctioned as lawful in any other state. The contrary appears to be the case, and even more strongly so than in New Jersey, because in all but a minimal number of states, by express statutory provision, preservation of the life of the mother is made the only excuse for abortion. But, even if there were some state or foreign country where an abortion for rubella were lawful, in the face of the present strong public policy of New Jersey against such an abortion, no cause of action for damages should be recognized in New Jersey if a

local physician did not advise his patient that some such forum existed.

Accordingly for the reasons expressed by Justice Proctor, as well as the additional grounds set forth herein, I agree that the order of the trial court dismissing the plaintiffs' claims should be affirmed.

JACOBS, J. (dissenting). When Mrs. Gleitman told her obstetricians that she had German measles (rubella), they were placed under a clear duty to tell her of its high incidence of abnormal birth. That duty was not only a moral one but a legal one as well. *Cf. Salgo v. Leland Stanford Jr. University,* 154 *Cal. App. 2d* 560, 578, 317 *P. 2d* 170, 181 (1957); *Mitchell v. Robinson,* 334 *S. W. 2d* 11, 18 (*Mo. Sup. Ct.* 1960); *Natanson v. Kline,* 186 *Kan.* 393, 350 *P. 2d* 1093, 1101, rehearing denied 187 *Kan.* 186, 354 *P. 2d* 670 (1960); *Dowling v. Mutual Life Insurance Co. of New York,* 168 *So. 2d* 107, 116 (*La. Ct. App.* 1964), *certiorari* denied 247 *La.* 248, 170 *So. 2d* 508 (1965); *DiRosse v. Wein,* 24 *A. D. 2d* 510, 261 *N. Y. S. 2d* 623, 624, leave to appeal denied 16 *N. Y. 2d* 487, 264 *N. Y. S. 2d* 1030, 212 *N. E. 2d* 447 (1965); *Annot.,* 79 *A. L. R. 2d* 1028 (1961). If the duty had been discharged, Mrs. Gleitman could have been safely and lawfully aborted and have been free to conceive again and give birth to a normal child. Instead she was told, according to her testimony which the majority assumes for present purposes to be true, that her child would not be at all affected. In reliance on that she permitted the pregnancy to proceed and gave birth to a child who is almost blind, is deaf and mute and is probably mentally retarded. While the law cannot remove the heartache or undo the harm, it can afford some reasonable measure of compensation towards alleviating the financial burdens. In declining to do so, it permits a wrong with serious consequential injury to go wholly unredressed. That provides no deterrent to professional irresponsibility and is neither just nor compatible with expanding principles of liability in the field of torts. See *Ekalo v. Con-*

*structive Serv. Corp. of America,* 46 *N. J.* 82, 93 (1965);
*Falzone v. Busch,* 45 *N. J.* 559 (1965); *Smith v. Brennan,*
31 *N. J.* 353 (1960).

While the wrong was done directly to Mrs. Gleitman, in
truth and reality it vitally affected her entire immediate fam-
ily. Her husband's standing and injury alongside her should
be self-evident since he was as intimately concerned with the
pregnancy and its consequences as was his wife. See *Ekalo v.
Constructive Serv. Corp. of America, supra,* 46 *N. J.,* at *p.*
93. And while logical objection may be advanced to the
child's standing and injury, logic is not the determinative
factor and should not be permitted to obscure that he has to
bear the frightful weight of his abnormality throughout life,
and that such compensation as is received from the defend-
ants or either of them should be dedicated primarily to his
care and the lessening of his difficulties. Indeed, if this were
suitably provided for in the ultimate judgment, the technical
presence or absence of the child as an additional party plain-
tiff would have little significance.

I find no substantial basis for the majority's notion that it
would be "impossible" for the court or jury to deal properly
with the matter of compensatory damages. The plaintiffs'
thesis, which a jury could reasonably accept, is that, were it
not for the breach of duty, the pregnancy would have been
lawfully terminated and the plaintiffs would have been spared
not only the incalculable emotional distress but also the read-
ily measurable medical and maintenance expenses causally re-
lated to the abnormality. Surely a judicial system engaged
daily in evaluating such matters as pain and suffering, which
admittedly have "no known dimensions, mathematical or
financial" (*Bolla v. Brunner,* 26 *N. J.* 82, 95 (1958)), should
be able to evaluate the harm which proximately resulted from
the breach of duty. Indeed, even if there were more evalua-
tion complexities than are truly present here, they would not
furnish any sound basis for the total denial of recovery. See
*Story Parchment Co. v. Paterson Parchment Paper Co.,* 282
*U. S.* 555, 51 *S. Ct.* 248, 75 *L. Ed.* 544 (1931); *Martin v.*

*Bengue, Inc.,* 25 *N. J.* 359, 373 (1957) ; *Jenkins v. Pennsylvania R. R. Co.,* 67 *N. J. L.* 331, 334 (*E. & A.* 1902). In the *Story Parchment Co.* case the Supreme Court expressed the following thoughts which bear emphasis here:

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. Eastman Kodak Co. [of New York] v. Southern Photo Materials Co., 273 U. S. 359, 379, 47 S. Ct. 400, 71 L. Ed. 684, 691. Compare The Seven Brothers (D. C.) 170 F. 126, 128; Pacific [Steam Whaling] etc. v. Alaska Packers' Ass'n, 138 Cal. 632, 638, 72 P. 161." 282 *U. S.,* at *p.* 563, 51 *S. Ct.,* at *p.* 250, 75 *L. Ed.,* at *p.* 548.

The majority rests its rejection of the plaintiffs' action not only on its expressed difficulties with damages but also on its views as to the State's "public policy." But there is no policy favoring the breach of duty here or its immunization. Nor is there any dispute that the Gleitmans could have terminated the pregnancy lawfully outside New Jersey, at least in some foreign country. While the majority does not pass on the issue, I believe that the pregnancy could also have been terminated lawfully within New Jersey. It should be borne in mind that Mrs. Gleitman had rubella during the first or second month of her pregnancy; studies have indicated that the danger of grave abnormality is highest when the rubella is contracted that early, with some estimates running as high as 60 per cent. See 287 *The Lancet* 373 (1964). During the first trimester, which was well before any quickening, the pregnancy could have been humanely terminated by an operation which is well-recognized in medical circles as "painless, simple and safe." See Guttmacher, "An Ob-

stetrician-Gynecologist Examines New York's Abortion Law," December 5, 1966.

In *State v. Cooper, 22 N. J. L. 52 (Sup. Ct. 1849)*, the termination of pregnancy before any quickening was held not to constitute a criminal offense at common law. During the year of *Cooper,* a New Jersey statute was enacted declaring abortions performed maliciously or without lawful justification to be criminal without regard to quickening. *L. 1849, p. 266.* But at that time in history, all abortions were considered medically dangerous, and the design of the statute, according to contemporaneous judicial expressions, "was not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts." *State v. Murphy, 27 N. J. L. 112, 114 (Sup. Ct. 1858).*

It is highly significant that, although New Jersey's abortion statute has been amended from time to time, its scope has always been expressly confined by the Legislature to abortions performed "maliciously or without lawful justification." See *L. 1849, p. 266; L. 1872, p. 45; L. 1881, p. 240; L. 1898, p. 827; R. S. 2:105-1; N. J. S. 2A:87-1.* At no time has the New Jersey Legislature departed from its general terminology by specifically defining, as many other state legislatures have, the particular situations which would constitute lawful justification. In *State v. Brandenburg, 137 N. J. L. 124, 127 (Sup. Ct. 1948),* Chief Justice Case indicated no doubt that preserving the mother's life would be justification although he declined to express any opinion as to whether preserving her health would suffice. In Massachusetts, the courts have assumed that under comparable legislative terminology, abortions are permissible to save the mother's life "or to prevent serious impairment of her health, mental or physical". *Commonwealth v. Brunelle, 341 Mass. 675, 171 N. E. 2d 850, 852 (1961).* And in our own State it is well-known that abortions have been and are being performed in good faith by highly qualified physicians in highly reputable hospitals, when necessary to preserve the life or health of the mother,

or to preclude the quickening of the fetus in rubella cases and the like. See Waugh, J., in *Sanitary Vendors, Inc. v. Byrne,* 72 *N. J. Super.* 276, 287 (*Law Div.* 1962), affirmed 40 *N. J.* 157 (1963).

After a painstaking study of current medical and legal practice and thought, the reporters of the American Law Institute submitted a proposed penal code permitting termination of pregnancy where the physician believes that continuance would gravely impair the physical or mental health of the mother, or that the child would be born with grave physical or mental defect, or that the pregnancy resulted from rape or incest. *Model Penal Code (Tentative Draft No. 9,* May 8, 1959) § 207.11, *p.* 144. See also *Model Penal Code (Proposed Official Draft,* May 4, 1962) § 230.3, *p.* 189. They also suggested that this result might be reached by judicial interpretation of statutes which prohibit unlawful abortion "without defining what is unlawful." *Tentative Draft No. 9,* at *p.* 154.

When the New Jersey Legislature enacted its abortion statute, it was clearly altering and not speaking in terms of the common law under which all terminations of pregnancy before quickening were noncriminal. It could have but did not speak in absolute prohibitory terms. Similarly it could have but deliberately chose not to confine the statutory exception to the preservation of the mother's life or to any other specific and defined grouping. Instead it used the phrase "maliciously or without lawful justification" (*N. J. S.* 2A:87–1), thus necessarily leaving the matter to interpretation by the judiciary; it took much the same course in *N. J. S.* 2A:170–76, where it prohibited the utterance of abortifacients "without just cause." While it must have contemplated that the judiciary would endeavor to carry out the over-all legislative purpose, it must also have contemplated that interpretation of its broad and flexible terminology would appropriately be made from time to time in the light of prevailing conditions. See *State v. Hudson County News Co.,* 35 *N. J.* 284 (1961); *Sanitary Vendors, Inc. v.*

*Byrne, supra,* 40 *N. J.* 157; 2 *Sutherland, Statutory Construction* § 5102 (3*d* ed. 1943); *cf. Pirkey Bros. v. Commonwealth,* 134 *Va.* 713, 114 *S. E.* 764 (1922), where the court, in sustaining an ancient Sunday law prohibiting labor other than "work of necessity or charity," pointed out that the statutory exception "must be construed with reference to the conditions under which we live." See *N. J. S.* 2A:171–1; see also *State ex rel. Heck's, Inc. v. Gates,* 149 *W. Va.* 421, 141 *S. E.* 2*d* 369, 378–379 (1965); *cf. N. J. S.* 2A:171–5.8; *State v. Monteleone,* 36 *N. J.* 93 (1961).

In *State v. Hudson County News Co., supra,* 35 *N. J.* 284, this Court had occasion to deal with *N. J. S.* 2A:115–2 which declares the sale of obscene literature to be criminal when made "without just cause"; as here, the Legislature had not defined the scope of the exception and the court proceeded to do so in the light of modern conditions and considerations. Similarly in *Sanitary Vendors, Inc. v. Byrne, supra,* 40 *N. J.* 157, this Court gave meaning to the exception in *N. J. S.* 2A:170–76 which prohibits the sale of contraceptives "without just cause"; it concluded that contraceptives may now generally be sold by physicians and druggists but may not be sold promiscuously through vending machines in public places. 40 *N. J.,* at *p.* 165. In both cases the judicial efforts were extended towards sustaining the legislative enactments by giving current content to their general phraseology, thus affording fair warning to those who might thereafter be affected and thereby avoiding any due process attacks. In neither case did anyone suggest that the court was precluded by the doctrine of separation of powers from taking that course and that consequently the statute must be stricken in its entirety, a result which courts traditionally strain to avoid. See *Grand Union Co. v. Sills,* 43 *N. J.* 390, 408–411 (1964); *Ward v. Scott,* 11 *N. J.* 117, 122–128 (1952).

If, as the cited history indicates, the New Jersey Legislature was primarily concerned with the "health and life of the mother" (*State v. Murphy, supra,* 27 *N. J. L.,* at *p.* 114), then surely a therapeutic termination of pregnancy to pre-

serve her life or health may be considered as falling within the contemplation of the statutory exception. And when the legislative purpose and general terminology are viewed alongside current medical science and understanding, a good faith eugenic termination "in accordance with accepted medical standards that an abortion is medically indicated," as the majority opinion phrases it, may also properly be considered as falling within the contemplation of the exception. See 2 *Sutherland, supra,* § 5102. Should the Legislature differ with any of this, it is of course at liberty to adopt an enactment clearly expressing its wishes and directions. In the meantime, common fairness to the physicians of New Jersey and those entrusted to their care, suggests that the question not be left open and that any doubts be resolved in favor of the individual's freedom of determination and noncriminality. See 3 *Sutherland, supra,* §§ 5604, 5605.

Justice SCHETTINO agrees with this dissent and joins me in voting to reverse the dismissal of the complaint and to remand the matter for trial.

WEINTRAUB, C. J. (dissenting in part). The legality of a eugenic abortion in New Jersey, which now overshadows the question whether plaintiffs should be compensated, entered this case rather tangentially. If such an abortion were criminal and if also such an abortion performed on a New Jersey domiciliary in a jurisdiction which deems the abortion to be lawful would nonetheless offend the policy of our State, then it would be arguable that our courts should not award damages against a physician who allegedly deprived a woman of an option thus to violate our statute or its policy by an act done here or elsewhere. The trial court took that view of the matter in directing judgment against the mother and father.

I

The majority opinion finds it unnecessary to decide whether a eugenic abortion runs afoul of our criminal law. Although

usually it is good judicial craftsmanship in such circumstances to abstain, especially if an issue is sticky, here the very suggestion that a question remains as to whether a eugenic abortion is criminal will be quite as forbidding as a flat holding that it is.

We know from material available to us that in cases of rubella during the first trimester of pregnancy abortions have been performed in New Jersey by reputable doctors in reputable hospitals, all of whom have believed such abortions to be lawful. In fact every doctor who testified in this case, including the defendants themselves, said that good medical practice requires informing a pregnant woman of the danger of deformity or defect if she has had German measles during the first trimester of her pregnancy, and, there being no other reason suggested for that advice, I assume good medical practice requires it to the end that she may seek an abortion, here or somewhere. When the highest court of the State even intimates the practice may be criminal, I would doubt that a reputable doctor or reputable institution would take the risk. Rather the question will likely be presented by some back-alley abortionist with all the diversion from the merits that a character of that kind can induce. Meanwhile, we can be sure, the pregnant woman who until now has had the services of the highest run of medical men and the safety of a hospital will deliver herself to dirty hands, if she can afford it, for a woman unwilling to risk the tragedy of rubella is not apt to accept anyone's judgment that she has no more say than a broodmare.

I have difficulty with the constitutionality of the abortion statute, at least as it would be applied here. The statute, N. J. S. 2A:87–1, makes guilty of a high misdemeanor any person who "without lawful justification" does any of the forbidden things with the intent to cause a miscarriage. The penalty is severe, the maximum imprisonment being seven years, N. J. S. 2A:85–6, unless "the woman or child shall die," in which event the imprisonment may be for 15 years, N. J. S. 2A:87–1. The statute, however, does not define

"lawful justification"; it does not say what fact—medical, sociological or economic—shall be "lawful justification."

We are not dealing with the delegation of legislative power to administrative agencies, as to which in some situations the Legislature may leave a problem to an agency for detailed solution. See *Shelton College v. State Board of Education,* 48 *N. J.* 501 (1967). Nor are we dealing with an offense which defies perfect definition so that there inevitably remain marginal areas in which one who enters is nonetheless conscious of a risk. See *Boyce Motor Lines v. United States,* 342 *U. S.* 337, 340, 72 *S. Ct.* 329, 96 *L. Ed.* 367, 371 (1952). As to the subject before us, it is a simple matter to tick off the specific situations and to state the ones in which "lawful justification" shall be found. Thus we readily know the question is whether "lawful justification" should exist (1) if there is a substantial risk to the life of the mother; or (2) if there is a substantial risk to the physical or mental health of the mother; or (3) if there is a like risk that the child will be born with grave physical or mental defect; or (4) if the pregnancy resulted from incest or rape (common law or statutory); or (5) if the mother is unmarried; or (6) if there will be economic or sociologic hardship; or (7) if the woman consents, for any or no reason. The *Model Penal Code,* § 230.3 (Proposed Official Draft, May 4, 1962), states specifically what constitutes justification, and lists essentially the first four factual patterns I have just set forth. Thus there is no reason why a legislature could not itself say what shall constitute justification.

There are two constitutional facets to legislative vagueness or ambiguity. One concerns the individual, who is entitled by due process to a reasonably explicit warning as to what he may not do. The other concerns the division of responsibility between the legislative and judicial branches of government, for although, I have no doubt, the judiciary inevitably has a creative role in deciding civil controversies, I do not believe it has a like responsibility with respect to criminal liability. As to that subject, it is the Legislature which

should decide what conduct shall be punishable, and although the judiciary should labor to find the legislative intent and to sustain it within constitutional bounds, it is something else to permit the Legislature to pass the policy decision to the judiciary. The point would be plain if the statute recited in so many words that the legislators were unable to agree upon what ought to be justification for a consensual abortion, and being thus unable to agree, the policy problem is assigned to the Supreme Court of the State with the hope that a majority of the Court will work it out. A delegation, with such frankness, would, I am sure, be refused by the Court, and yet the issue is the same whenever a court is unable to discover *what the Legislature intended* and must therefore read into the statute what the judge thinks the legislators ought to have agreed upon if they had his wisdom and courage.

In this connection, it is helpful to refer to two recent opinions of our Court. *State v. Hudson County News Co.,* 35 *N. J.* 284 (1961), involved *N. J. S.* 2A:115–2 which makes it a crime to utter, expose or sell obscene or indecent books, etc., "without just cause." The action was for a declaratory judgment. The phrase "without just cause" was attacked as *too vague in terms of the individual's right to be forewarned.* The subject being obscenity, as to which all efforts to be precise have failed, the Court correctly recognized the legislative problem and accorded the individual a needed measure of protection by restraining the terms of the statute, first, by requiring a "scienter" consisting of the vendor's actual knowledge of the content of the book (at *p.* 295), and, second, by concluding that "just cause" exists "where the nature of the possession and distribution is not related to the appeal to prurient interest" (at *p.* 297), thereby finding concreteness for the phrase "without just cause" in the very subject of the legislative ban, obscenity.

More troublesome, in my view, is *N. J. S.* 2A:170–76 which makes it a disorderly persons offense to expose for sale or sell contraceptives "without just cause." This statute was sustained in *Sanitary Vendors, Inc. v. Byrne,* 40 *N. J.* 157

(1963). Again, as in the case just discussed, the attack was in terms of due process, that is, the individual's right to fore-warning, and not in the further terms of separation of the powers of government. There this Court found the legislative intent was to deal with the mode of vending, rather than to prevent a sale, and holding that the Legislature meant no more than to ban a mode of vending that would aid parties to illicit sexual relations, the Court concluded that a sale by vending machine was bad whereas a sale across the drug-gist's counter was not. The Court thought the situation was "nonmarginal" and noted that a judicial statement of the statute's meaning in a declaratory judgment proceeding served to give the individual ample warning for the future. But in *Sanitary Vendors* there seems not to have been raised the question whether the statute was just an incomplete act of legislation whereby the Legislature passed to the judiciary for gestation the touchy subject of contraception.

Contraception and abortion have this in common, that whereas in most areas of criminal prohibition the fact of evil is evident to most people, here there is evil or none at all depending wholly upon a spiritual supposition, for while men agree it is wrong to take life, yet, knowing nothing about the void before or after their earthly presence, they cannot agree upon the point at which a living thing should be thought to be human in its being. We know there is "life" in the ovum and sperm before conception, but as to the moral-ity of contraception, every argument starts from and returns to an ethical or religious assumption. Hence he who opposes and he who supports contraception is equally sure he serves the dignity of man. And so as to abortion, men cannot agree upon the stage at which an embryo or fetus has a claim to acquire life in human form strong enough to override a woman's right to her own bodily integrity. It is not surpris-ing, therefore, that as to both contraception and abortion, the legislators were able to agree only upon such vagueness as "without just cause" and "without lawful justification."

I have not overlooked the possibility that the Legislature meant by "lawful justification" to refer to the justification available with respect to the common-law crime and thus spoke with specificity. I think that thesis cannot be accepted.

The common-law crime had a different object in view. The common-law offense was designed to protect the life of the fetus, and upon the postulate that life began when the fetus stirred in the mother's womb, it was an abortion thereafter which alone was criminal. *State v. Cooper,* 22 *N. J. L.* 52 (*Sup. Ct.* 1849). The statute, which was enacted in 1849 (*L.* 1849, *p.* 266), the year of the *Cooper* decision, had a different, or at least still another, objective; it was to protect the pregnant woman in her life and in her health, and to that end the statute made the abortion a crime on the part of third persons, whether the child was quick or not. So in *State v. Murphy,* 27 *N. J. L.* 112, 114–115 (*Sup. Ct.* 1858), the court said:

"* * * The design of the statute was not to prevent the procuring of abortions, so much as to guard the health and life of the mother against the consequences of such attempts."

and that:

"* * * No act of hers is made criminal by the statute. Her guilt or innocence remains as at common law. Her offense at the common law is against the life of the child. The offence of third persons, under the statute, is mainly against her life and health. The statute regards her as the victim of crime, not as the criminal; as the object of protection, rather than of punishment."

This view has been repeated in a series of cases since then.[1]

---

[1] *State v. Hyer,* 39 *N. J. L.* 598, 600 (*Sup. Ct.* 1877) ; *State v. Gedicke,* 43 *N. J. L.* 86, 89 (*Sup. Ct.* 1881) ; *State v. Loomis,* 89 *N. J. L.* 8, 9 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 216 (*E. & A.* 1917) ; *State v. Mandeville,* 89 *N. J. L.* 228, 231 (*E. & A.* 1916) ; *In re Vince,* 2 *N. J.* 443, 450 (1949) ; *State v. Siciliano,* 21 *N. J.* 249, 258 (1956). The statute of 1849 provided for greater punishment if the woman died. By *L.* 1872, *c.* 337, *p.* 45, the act was amended to provide for greater punishment if either the woman or the

The statutory objective being different, we ought not to assume that the Legislature meant by "lawful justification" to refer to the justification the common law devised with respect to a common-law offense created to serve another value. If the common law, being concerned solely with the *life* of the fetus, recognized only the preservation of the *life* of the mother as justification for the destruction of a fetus that is quick, we could not safely conclude that the statute intended, at least before the fetus is quick (and that is the situation involved in this case), that the sole justification for an abortion would be the preservation of the life of the mother. If the preservation of the *health* of the mother was within the object of the statute, the statute would be turned against her if she could not have terminated a pregnancy which is a threat to her health equal to or greater than the health risk in the abortion. The question whether the woman's health may justify an abortion under the statute was expressly left open in *State v. Brandenburg*, 137 *N. J. L.* 124, 127 (*Sup. Ct.* 1948). I note that when the Massachusetts statute read as our statute reads, protection of her health was found to be lawful justification. *Commonwealth v. Wood*, 77 *Mass.* 85 (*Sup. Jud. Ct.* 1858); see *Commonwealth v. Brunelle*, 341 *Mass.* 675, 171 *N. E. 2d* 850 (*Sup. Jud. Ct.* 1961).

Further, it is so easy to state what shall be justification that it is unlikely the legislators, if they were in agreement, would have expressed it by such indirection, especially since the common law itself was rather obscure upon the topic.[2]

---

"child" should die. *Siciliano* lists "the protection of the unborn child" as an objective along with the protection of "the life and health of the mother." Whether "child" includes every fetus that is quick is not immediately clear, but if it does, it is still the object of the statute to protect the mother's health.

[2] It is generally assumed in expressions since the American Revolution that the common law deemed the preservation of the life of the mother to be justification. See 3 *Burdick, Law of Crimes* (1946), § 871, *p.* 287. I accept that proposition for present purposes although I have not come upon either a decision or a treatise written prior to the American Revolution which states what constitutes justification.

The vast majority of the State legislatures defined justification in explicit terms.[3]

In any event, if "lawful justification" does refer to the common law, the question would remain whether we could find in the common law the answer to the question whether a eugenic abortion is justifiable. The reason is that the common-law judge never dealt with the question. Then (and as well in 1849 when the statute was adopted) there apparently was no medical basis to anticipate a defective offspring. The ravages of rubella were first established in 1941, and the hazards of X-ray and certain drugs are also recent discoveries. Accordingly we cannot know how the common-law judge would have dealt with such a situation, even if the fetus were quick.

For these reasons I have grave doubt that the statute contains a full legislative decision. The Comment in the *Model Penal Code* (Tentative Draft No. 9, May 8, 1959) suggests that a court might find it permissible to abort a probably defective offspring under the few statutes which prohibit "unlawful" abortions (*pp.* 153–154). Perhaps so, and if it is, it would be equally true of a statute which speaks of "lawful justification." At any rate, I could not conclude the statute expresses a discernible legislative intent to make such an abortion criminal. In an area in which so many disagree with honor, in which, even in States which define justification in terms of the life of the mother, there has been widespread belief that a eugenic abortion in such circumstances is lawful,[4] I am not willing to find that it is not. I believe preg-

---

[3] The abortion statutes in most States specify the life of the mother, with a few adding a threat to her health. See the exhaustive comment in Tentative Draft No. 9 of the *Model Penal Code* (May 8, 1959), *p.* 146.

[4] The Comment to the *Model Penal Code* (Tentative Draft No. 9, May 8, 1959), speaking of such abortions, states that "Despite the uncertain status of eugenic as distinguished from therapeutic abortion, such operations are regularly performed by responsible physicians in hospitals throughout the country." (at *p.* 154) See also Kummer and Leavy, "Therapeutic Abortion Law Confusion," 195 *Journal of American Medical Ass'n* 140 (1966).

nant women would not accept that decision unless their ethical or religious conviction accorded with it. For the others, if they could afford the illegal abortion, the result would be all the risks of that business. I would leave it to the Legislature to condemn such an abortion if it is so minded.

## II

With respect to the claim advanced on behalf of the infant, I agree with the majority that it cannot be maintained. Ultimately, the infant's complaint is that he would be better off not to have been born. Man, who knows nothing of death or nothingness, cannot possibly know whether that is so.

We must remember that the choice is not between being born with health or being born without it; it is not claimed the defendants failed to do something to prevent or reduce the ravages of rubella. Rather the choice is between a worldly existence and none at all. Implicit, beyond this claim against a physician for faulty advice, is the proposition that a pregnant woman who, duly informed, does not seek an abortion, and all who urge her to see the pregnancy through, are guilty of wrongful injury to the fetus, and indeed that every day in which the infant is sustained after birth is a day of wrong. To recognize a right not to be born is to enter an area in which no one could find his way.

As to the mother and father, the situation is different. I think the option to abort is hers, and that a wrong is done her (and derivatively her spouse) if she is not told of the risk or is assured there is none. Defendants say they did advise her, and of course we do not pass upon the factual dispute between them and her. The question is whether she was entitled to have the jury find where the truth lies, and hence the question before us is only whether she would be ·entitled to recover if she satisfied a jury (1) that, as she claims, she was told there was no risk of a defective child and (2) that she would have elected an abortion if she had been correctly informed.

Troublesome, however, is the measure of damages. Two major elements come to mind at once—the cost of medical cure and the cost of maintenance of the child who is so deformed or defective as to require special care.

In a case of tortious injury the right to cure and care belongs to the injured party, and basically that is equally true if the injured person is a child even though a parent who pays for cure or care pursuant to the duty the law imposes upon a parent may sue in his own name to recover that loss. In the usual case, the parent's claim, at least in its inception, is derivative and dependent upon the accrual of a right in the child. See *Orr v. Orr, 36 N. J.* 236, 239 (1961). In a sense the parent is subrogated *pro tanto* to the child's cause of action. If here the parent's claim is viewed in these conventional terms, there can be no recovery for the expense of cure or care because defendants did not injure the child.

But there is an injury to the mother, and the question is whether a claim for the infant's cure and care can be said to flow from that injury. Even though there is an obvious connection between the loss of the option to abort and those costs, it seems to me that the parent's claim for the infant's cure and care must ultimately presuppose it would have been to the child's own interest not to have been born. The claim for cure and care is the child's, whether it is asserted on the child's behalf against a wrongdoer or against the mother or father or anyone else who in law must furnish it, and when a parent seeks to shift that burden to a tortfeasor, it must be, I think, upon the premise that the tortfeasor did a wrong to the child. If the child's estate bore the cost of cure and care as in some cases it might, the child could not recover that cost from the physician for the reason already given. It would be anomalous to say that a physician, although not liable to an infant who incurred that dollar loss, must pay for it when someone else, whether father, mother, other relative, or the State itself, incurs the expense.

But in other respects the mother is hurt in her own right by the denial to her of her option to accept or reject a

parental relationship with the child. The father, too, although his right is wholly dependent upon the mother's decision, is so directly concerned in her decision that he may fairly be regarded as a victim of a wrong done to her. No doubt it would be difficult to assess the amount of the injury, but the law should try to compensate for it, if only to reinforce the duty of due care. I would permit the trier of the facts to put a price on the loss of that option.

I would stress that the valuation could not be made by contrasting the defective child with a normal one, because that was not the option. We cannot go on the hypothesis that the mother would have had the abortion and thereafter conceived and delivered a healthy child. We are dealing with human beings and not with fungibles, and the damages are those suffered with respect to this child. The pain of the parents must be measured against the joy they find in him as he is.

It would be difficult to strike a net balance between the intangible pluses and minuses in a parent-child relationship, and it would be the rare case in which a parent would testify that it is his or her present wish that the child had not been born. No one who has witnessed the love of a parent for an imbecile could expect so crass a computation from the parent's lips. But I believe that even without such testimony an outsider could evaluate the injury, and I would recognize a right in the parents to seek that evaluation, subject to careful judicial supervision, in order to support the woman's right to choose whether to risk this misfortune.

*For affirmance*—Justices FRANCIS, PROCTOR, HALL and HANEMAN—4.

*For reversal in part*—Chief Justice WEINTRAUB—1.

*For reversal*—Justices JACOBS and SCHETTINO—2.