75 N.J. 49 (1977)
379 A.2d 841
PLANNED PARENTHOOD OF NEW YORK CITY, INC., A NONPROFIT CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF INSTITUTIONS AND AGENCIES AND DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES, DEFENDANTS-RESPONDENTS.
The Supreme Court of New Jersey.
Argued January 25, 1977.
Decided November 1, 1977.
*51 Mr. Alfred L. Ferguson argued the cause for appellant (Messrs. McCarter and English, attorneys; Mr. Ferguson and Mr. Richard M. Eittreim, of counsel and on the brief).
Mr. Robert E. Popkin, Deputy Attorney General, argued the cause for respondents (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
PER CURIAM.
The issue in this case concerns the attempt of the plaintiff, Planned Parenthood of New York City, Inc., to obtain reimbursement from the Division of Medical Assistance and Health Services of the Department of Institutions and Agencies (now Department of Human Services) for costs of abortions performed in New York on 550 residents of New Jersey. The abortions occurred prior to January 22, 1973, the date when the United States Supreme Court declared a woman's right to have an abortion in the first trimester of pregnancy to be of a federal constitutional dimension. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, reh. den. 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973); Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, reh. den. 410 U.S. 959, 93 S.Ct. 1410, 35 L.Ed.2d 694 (1973).
The Director of the Division of Medical Assistance and Health Services denied the plaintiff's application. On appeal *52 the Appellate Division affirmed. 138 N.J. Super. 450 (1976). We granted certification. 71 N.J. 329 (1976).
The plaintiff advances a fourfold argument. First, it contends that the principle of Roe v. Wade, supra, and Doe v. Bolton, supra, should be applied retroactively so that the plaintiff should be entitled to reimbursement for the costs of abortions performed before January 22, 1973. Second, the abortions would not have been illegal if performed in New Jersey before the Roe and Doe decisions and are accordingly reimbursable under the terms of the State plan for medicaid even if performed outside New Jersey. Third, federal statutes and regulations require reimbursement. Last, denial of reimbursement violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.
The Appellate Division, after carefully considering all pertinent factors, rejected the claim that Roe v. Wade and Doe v. Bolton were entitled to retroactive application. 138 N.J. Super. at 454-456. We agree with that finding essentially for the reasons stated by the Appellate Division.
We disagree with plaintiff's claim that prior to January 22, 1973 non-therapeutic abortions were lawful in New Jersey. Before that date, as plaintiff concedes in its Appellate Division brief, non-therapeutic abortions "were considered to be illegal." At that time the only abortions held lawful by the New Jersey courts were those performed to preserve a woman's life. State v. Moretti, 52 N.J. 182, 191, cert. den. 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968); Gleitman v. Cosgrove, 49 N.J. 22 (1967). The plaintiff's reliance upon Young Women's Christian Ass'n of Princeton v. Kugler, 342 F. Supp. 1048 (D.N.J. 1972), motion for stay denied, 463 F.2d 203 (3d Cir.1973), vacated and remanded 475 F.2d 1398 (3d Cir.1973), judgment reinstated, Civil No. 264-70 (D.N.J. July 24, 1973), aff'd 493 F.2d 1402 (3d Cir.1974), cert. den. 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885 (1974), is misplaced. In that case, the United States District Court's final effective judgment declaring nine physicians free from criminal *53 responsibility under the abortion statute, N.J.S.A. 2A:87-1, was not forthcoming until July 24, 1973, some six months after Roe and Doe were decided. In passing we also note that we were not bound by a lower federal court's decision invalidating the New Jersey abortion statute. State v. Norflett, 67 N.J. 268, 286 (1975). Accordingly, under the law then existing, non-therapeutic abortions would have been illegal in New Jersey prior to January 22, 1973.
The plaintiff's third contention that Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., and regulations promulgated thereunder mandate reimbursement is misguided. Under Title XIX "a State plan for medical assistance must ... provide for inclusion, to the extent required by regulations prescribed by the Secretary, of provisions (conforming to such regulations) with respect to the furnishing of medical assistance under the plan to individuals who are residents of the State but are absent therefrom." 42 U.S.C. § 1396a(a) (16). The federal regulations promulgated pursuant to the act provide that "[m]edical assistance will be furnished to eligible individuals who are residents of the State but are absent therefrom to the same extent that such assistance is furnished under the plan to meet the cost of medical care and services rendered to eligible individuals in such State...." 45 C.F.R. § 248.40(a) (1). Admittedly, the New Jersey plan did not furnish such abortion services. To sanction payments for abortions rendered outside the State would evade the intent and purpose of the New Jersey plan not to pay for abortions. The plaintiff has directed our attention to another section of the same regulation which requires that medical care and services be included in the plan when it is the "general practice for residents of a particular locality to use medical resources outside the State," 40 C.F.R. § 248.40(a)(2)(i). This provision, however, becomes effective only if the plan provides for such care and services within the State. Any other result would be inconsistent with the Social Security Act, particularly 42 U.S.C. § 1396a(a)(1) which requires *54 that the medical assistance plan "be in effect in all political subdivisions of the State...." If a state provided certain medical assistance to eligible residents who happened to have access to medical facilities and services outside the state, and not to those who did not have such access, the substance of the plan would be governed by the geographical convenience of the medicaid recipient contrary to the spirit of the statewide criteria of 42 U.S.C. § 1396a(a)(1).[1]
The plaintiff's last argument is addressed to the equal protection clause of the Fourteenth Amendment. Plaintiff asserts that because New Jersey medicaid recipients in 1972 could go to term in either New York or New Jersey and have their medical expenses reimbursed, equal treatment must be accorded to those medicaid recipients who elected to end their pregnancies. Passing the question of the plaintiff's standing as a creditor to raise the constitutional claim of its patients, we note that the United States Supreme Court has recently rejected the rationale advanced by the plaintiff. Maher v. Roe, ___ U.S. ___, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). The Supreme Court held that financial need alone is not a criterion of a suspect classification and that differentiating between state financial assistance for nontherapeutic abortions and for childbirth is rationally related to the proper purpose of "encouraging normal childbirth." Beal v. Doe, ___ U.S. ___ at ___, 97 S.Ct. 2366 at 2372, *55 53 L.Ed.2d 464 at 473 (1977). The plaintiff's claim based on the equal protection clause of the Fourteenth Amendment is not sustainable.
In a letter to this Court after oral argument, the plaintiff for the first time urges that we interpret the implied equal protection guarantee of Article 1, Section 1 of the State Constitution to be more demanding than that of the federal constitution. This issue has not been briefed or argued by the parties. Under these circumstances we deem it inappropriate to consider and pass upon the question. Presbyterian Homes v. Division of Tax Appeals, 55 N.J. 275, 289 (1970).
Affirmed.
PASHMAN, J., concurring.
I concur with the holding of the Court today that Planned Parenthood is not entitled to reimbursement for the cost of performing elective abortions on New Jersey residents at an out-of-state clinic prior to the January 22, 1973 decisions of the United States Supreme Court in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Planned Parenthood would be entitled to reimbursement only if a retroactive application of the Roe and Doe decisions were indicated by the facts of this case. However, no such indication is present. Plaintiff had received notice that New Jersey Medicaid did not reimburse for abortion services on or about June 5, 1972, the date that Planned Parenthood was declared eligible as an out-of-state provider of health services for New Jersey residents.[1] At the time the services were *56 rendered by plaintiff, it is difficult to see how any reasonable expectation of reimbursement from New Jersey Medicaid could have existed.
In State v. Nash, 64 N.J. 464 (1974), this Court enumerated the following considerations for utilization in determining whether retroactivity is to be accorded a court decision declaring constitutional principles:
... (1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice. This weighing process has generally been followed in New Jersey.
[64 N.J. at 471]
In applying these considerations to the instant factual situation, it is clear that retroactivity is undesirable. Both the State and the insurer relied on the assumption that reimbursement was not permitted and plaintiff had notice of that fact. I also note that the abortions are an accomplished fact. Thus, lack of retroactivity will not harm the indigent women who have obtained them.
Although concurring with the majority's decision in this case, I feel obligated to add that this holding should not be interpreted to apply to reimbursement for elective abortions in the post-Roe era. In fact, Planned Parenthood has been reimbursed for abortions that were done after Roe. Furthermore, the Court's decision should in no way be construed as a judicial sanctioning of the validity of N.J.S.A. 30:4D-6.1, L. 1975, c. 261, § 1, effective December 18, *57 1975, which prohibits payments for termination of a woman's pregnancy for any reason except where it is medically necessary to save her life. This is a question for another day. Neither should the recent decision of the United States Supreme Court in Maher v. Roe, ___ U.S. ___, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) be considered as dispositive of the equal protection issue under the New Jersey Constitution.
The protections emanating from N.J. Const. (1947), Art. I, par. 1, can be broader than those in the United States Constitution.[2]Robinson v. Cahill, 62 N.J. 473 (1973), cert. den. 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973). As the late Chief Justice Weintraub pointed out in Robinson, when deciding an equal protection issue, the United *58 States Supreme Court often has different considerations in mind than would a state court.
The question whether the equal protection demand of our State Constitution is offended remains for us to decide. Conceivably a State Constitution could be more demanding. For one thing, there is absent the prinicple of federalism which cautions against too expansive a view of a federal constitutional limitation upon the power and opportunity of the several States to cope with their own problems in the light of their own circumstances. The majority in Rodriguez [San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)] expressly noted that `every claim arising under the Equal Protection Clause has implications for the relationship between national and state power under our federal system,' adding that `it would be difficult to imagine a case having a greater potential impact on our federal system than the one now before us, in which we are urged to abrogate systems of financing public education presently in existence in virtually every State' (93 S.Ct. at 1302).
[62 N.J. at 490-91]
Moreover, Mr. Justice Brennan has recently encouraged state courts to make their own analysis of the extent of rights and protections afforded by state constitutional provisions which seemingly parallel provisions of the Bill of Rights and subsequent Constitutional amendments.
This pattern of state court decisions puts to rest the notion that state constitutional provisions were adopted to mirror the federal Bill of Rights. The lesson of history is otherwise; indeed, the drafters of the federal Bill of Rights drew upon corresponding provisions in the various state constitutions. Prior to the adoption of the federal constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions. And prior to the adoption of the fourteenth amendment, these state bills of rights, independently interpreted, were the primary restraints on state action since the federal Bill of Rights had been held inapplicable.
The essential point I am making, of course, is not that the United States Supreme Court is necessarily wrong in its interpretation of the Federal Constitution, or that ultimate constitutional truths invariably come prepackaged in the dissents, including my own, from decisions of the Court. It is simply that the decisions of the Court are not dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and *59 state court judges and the members of the bar seriously err if they so treat them. Rather, state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees. I suggest to the bar that, although in the past it might have been safe for counsel to raise only federal constitutional issues in state courts, plainly it would be most unwise these days not also to raise the state constitutional questions.

* * * * * * * *
Every believer in our concept of federalism, and I am a devout believer, must salute this development in our state courts. * * * [Federalism] must necessarily be furthered significantly when state courts thrust themselves into a position of prominence in the struggle to protect the people of our nation from governmental intrusions on their freedoms.
[William J. Brennan, Jr., "State Constitutions and the Protection of Individual Rights," 90 Harv. L.R. 489, 501-03 (Jan. 1977); footnotes omitted.]
The proposition that the equal protection guarantees of the Fourteenth Amendment and those in the New Jersey Constitution are not coterminous became fact in Robinson v. Cahill, supra, when Chief Justice Weintraub refused to adopt the federal two-tier test with respect to fundamental rights.[3] He found the fundamental right doctrine to be undefinable in any useful sense, noting that property rights are just as explicitly or implicitly guaranteed in the Constitution *60 as are the rights found to be fundamental, yet are nowhere accorded such an exalted status. 62 N.J. at 492. Likewise, the Chief Justice found little in the cases to indicate which state interests are "compelling." Id. He concluded that
... [m]echanical approaches to the delicate problem of judicial intervention under either the equal protection or the due process clauses may only divert a court from the meritorious issue or delay consideration of it. Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * *
[Id.; emphasis added]
Thus, as was noted in Taxpayers Association of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976), New Jersey has adopted the two-tiered analysis only with regard to "suspect criteria." 71 N.J. at 285. Conversely,
... [w]here an important personal right is affected by governmental action, this Court often requires the public authority to demonstrate a greater `public need' than is traditionally required in construing the federal constitution. Specifically, it must be shown that there is an `appropriate governmental interest suitably furthered by the differential treatment.' [citations omitted] Even under more traditional approaches, New Jersey has always required a real and substantial relationship between the classification and the governmental interest which it purportedly serves. [citations omitted]
[71 N.J. at 286-87]
In Maher v. Roe, supra, the Supreme Court held that Roe v. Wade, supra, did not declare an unqualified constitutional right to an abortion.
Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a state to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.
[___ U.S. at ___, 97 S.Ct. at 2382, 53 L.Ed.2d at 494]
*61 Mr. Justice Powell found a rational basis for the state regulation providing funds for therapeutic abortions and for care incident to childbirth, but denying funds for elective abortions. The state was found to have a strong interest in protecting the potential life of the fetus. ___ U.S. at ___, 97 S.Ct. at 2385, 53 L.Ed.2d at 497. The effect of the challenged regulation would be to ban Medicaid abortions for the poor. I have serious doubts as to the constitutionality of such a prohibition. It may well violate the equal protection guarantees inherent in Art. I, par. 1 of the New Jersey Constitution by making an irrational distinction between groups of pregnant women.
This case is not a proper vehicle for deciding whether the equal protection guarantees in the New Jersey Constitution include the right to decide whether to carry a pregnancy to term unburdened by the intrusion of state economic incentives designed to induce desired behavior. However, it is noteworthy that with respect to significant rights, New Jersey's version of equal protection may be more exacting than the traditional rational basis test used in federal cases when a non-fundamental interest is affected. In fact, Chief Justice Weintraub's formulation in Robinson v. Cahill, ante at pp. 59-60 of 75 N.J. (Pashman, J., concurring) is much closer to Mr. Justice Marshall's suggested equal protection standard announced in his dissent in Beal v. Doe, ___ U.S. ___, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), than it is to a rational basis test. Justice Marshall advocates repudiation of the two-tier equal protection analysis.
As I have argued before, an equal protection analysis far more in keeping with the actions rather than the words of the Court [citation omitted] carefully weighs three factors  the importance of the governmental benefits denied, the character of the class, and the asserted state interests.
[___ U.S. ___, 97 S.Ct. at 2396, 53 L.Ed.2d at 480]
Therefore, it is arguable that the State Constitution may require a more compelling justification for the disparate *62 treatment of pregnant women in the post-Roe v. Wade era, than that which the Supreme Court accepted in Maher v. Roe.
PASHMAN, J., concurring in the result.
For affirmance  Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and SCHREIBER and Judges CONFORD and CARTON  7.
For reversal  None.
NOTES
[1] The Supreme Court in Beal v. Doe, ___ U.S. ___, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), has clearly rejected the argument that the states which finance full-term pregnancies and therapeutic abortions are under a statutory mandate to pay for the costs of non-therapeutic abortions performed within the state. Were we to adopt plaintiff's position, we would, in essence, have reached the odd conclusion that although Congress did not intend to compel states to subsidize the costs of non-therapeutic abortions within the state, it did intend to mandate reimbursement for identical procedures performed outside the state. Interpretations of statutes which lead to unreasonable results are to be avoided. State v. Gill, 47 N.J. 441, 444 (1966). Accord, United States v. Katz, 271 U.S. 354, 46 S.Ct. 513, 70 L.Ed. 986 (1926).
[1] Mr. Paul Anderson, Associate Manager of the Provider Services Division of Prudential, the State's insurance carrier for Medicaid claims, testified at the hearing that Planned Parenthood, as a certified provider of Medicaid services, was sent a package of materials which would include a New Jersey Health Services Program Newsletter of November 12, 1971. This newsletter indicated that elective abortions would not be funded by the State. Planned Parenthood admitted that the newsletter could have been included in the materials received. Furthermore, Prudential's Supervisor for Medicaid Claim Processing, Miss Joanne Gross, noted that she informed Planned Parenthood's Office Manager for Submission of Medicaid Claims of the policy announced in the newsletter in a June 2, 1972 phone conversation. Mr. Anderson also testified that about a week later, in response to a follow-up telephone call from Planned Parenthood's Manager, he reiterated the State policy and probably read the newsletter verbatim over the telephone.
[2] New Jersey has no clause in its Constitution directly analogous to the Fourteenth Amendment. However, the Supreme Court of New Jersey has articulated a viable equal protection doctrine bottomed on a number of provisions of N.J. Const. (1947). Article I, par. 1 has most often been referred to as the section requiring equal protection. Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 285 (1976); So. Burl. Cty. N.A.A.C.P. v. Tp. of Mt. Laurel, 67 N.J. 151, 174-75 (1975), Robinson v. Cahill, 62 N.J. 473, 482 (1973); Bailey v. Engleman, 56 N.J. 54, 55 (1970); General Public Loan Corp. v. Director, Div. of Taxation, 13 N.J. 393, 401 (1953).

Other provisions of the State Constitution have also been referred to as requiring equal treatment. Art. I, par. 5 was cited in Taxpayers Assn. of Weymouth v. Weymouth Tp., supra 71 N.J. at 285. In General Public Loan Corp. v. Director, Div. of Taxation, supra, 13 N.J. at 401, Art. IV, § 7, pars. 7, 8, 9 were referred to as the group of constitutional provisions constituting equal protection clauses. Art. IV, § 7, par. 7 has been referred to by the Court when dealing with the reasonableness of classifications for legislative purposes. Alfred Vail Mutual Ass'n v. Borough of Shrewsbury, 58 N.J. 40, 52 (1971).
This brief survey of the case law indicates that equal protection rights and the requirement for reasonable classifications germane to a legislative purpose are inherent in many provisions of the N.J. Const. (1947). So pervasive are such expressions that these rights may be termed the most fundamental guarantee of that Constitution. See Robinson v. Cahill, 119 N.J. Super. 40, 48-49 (Law Div. 1972), mod. 62 N.J. 473 (1973).
[3] The federal courts' approach to equal protection analysis requires an initial determination of the level of scrutiny that given legislation is to be subjected to and only then analyzes the case on its facts. In San Antonio School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16, 33 (1973), the Supreme Court announced that if the legislation operates to the disadvantage of some suspect class or impinges on some fundamental right explicitly or implicitly protected by the Constitution, strict scrutiny is in order. If not, the rational basis test is used. The strict scrutiny test requires the state to show a compelling interest to validate its disparate treatment of like classes. Under the rational basis test, any furthering of a legitimate articulated state purpose will validate the legislation.