247 N.J. Super. 502 (1991)
589 A.2d 1041
JUDY HUMMEL, AS GUARDIAN AD LITEM FOR KELLY HUMMEL, PLAINTIFF-APPELLANT,
v.
DR. NORMAN REISS, ST. MICHAEL'S HOSPITAL, JOHN DOES, M.D. 1-10, SAID NAMES BEING FICTITIOUS AND UNKNOWN, JOHN ROES, 1-10, SAID NAMES BEING FICTITIOUS AND JANE DOES, 1-10, SAID NAMES BEING FICTITIOUS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1990.
Decided April 26, 1991.
*503 Before Judges KING, LONG and R.S. COHEN.
Bruce H. Nagel argued the cause for appellant (Nagel & Rice, attorneys).
Richard P. Maggi argued the cause for respondent, St. Michael's Hospital (McDermott & McGee, attorneys).
James R. Korn argued the cause for respondent, Norman Reiss, M.D. (McDonough, Korn & Eichhorn, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
This case presents a claim for damages for extraordinary expenses for "wrongful life" or "wrongful birth" where the plaintiff's delivery occurred before the historic decision in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The plaintiff, Judy Hummel, claims that the defendants departed from acceptable medical standards "by refusing to provide [her] with the treatment option of aborting her pregnancy."
The record seems clearly to demonstrate that the plaintiff, Judy Hummel, could have legally obtained a "therapeutic" *504 abortion because her health, indeed perhaps her life, was threatened by her complicated pregnancy in 1971. She alleges that her physician, defendant Dr. Reiss, and the hospital authorities decided that instead she should go to term and attempt to deliver the child. Judy Hummel survived the pregnancy and delivery with no complications and has made no claim for damages in her own right. This claim before us is advanced for the extraordinary expenses for the care of the child, Kelly Hummel, now age 19, who is severely crippled and deformed, over her lifetime.
We perceive the legal issue as whether the child, Kelly Hummel, has a cause of action for extraordinary expenses under Procanik by Procanik v. Cillo, 97 N.J. 339, 352, 478 A.2d 755 (1984), because her mother's physician in 1971 declined to advise her properly, declined to perform, or to obtain for her a eugenic abortion because of the likelihood that the fetus would be born with severe defects. We conclude that since any breach of duty here occurred pre-Roe v. Wade, the duty was to the mother alone. In 1971 the mother could obtain only a "therapeutic" abortion in this State. She had no right in New Jersey at that time to a eugenic abortion, one directed solely to eliminate a potentially defective fetus. Since the breach of duty, if any, to the mother to advise about or perform a therapeutic abortion caused her no damage, she did not make a claim in her own right. We thus conclude that the child now has no claim because the physician had no duty, indeed no right, in 1971 in this State to perform an abortion solely to eliminate a suspected defective fetus.
In Planned Parenthood of New York City v. New Jersey Dep't. of Institutions, 75 N.J. 49, 379 A.2d 841 (1977), our Supreme Court considered a claim of the retroactive application of Roe v. Wade for purposes of civil liability, there reimbursement from the State for the cost of 550 abortions performed before January 22, 1973. The Supreme Court's ruling on retroactivity was most explicit. The Court said:

*505 The Appellate Division, after carefully considering all pertinent factors, rejected the claim that Roe v. Wade and Doe v. Bolton [410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)] were entitled to retroactive application. [Planned Parenthood of New York City v. New Jersey Dep't of Institutions] 138 N.J. Super. [450] at 454-456 [351 A.2d 382 (1976)]. We agree with that finding essentially for the reasons stated by the Appellate Division.
We disagree with plaintiff's claim that prior to January 22, 1983 non-therapeutic abortions were lawful in New Jersey. Before that date, as plaintiff concedes in its Appellate Division brief, non-therapeutic abortions "were considered to be illegal." At that time the only abortions held lawful by the New Jersey courts were those performed to preserve a woman's life. State v. Moretti, 52 N.J. 182, 191 [244 A.2d 499] cert. den. 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968); Gleitman v. Cosgrove, 49 N.J. 22 [227 A.2d 689] (1967). [75 N.J. at 52, 379 A.2d 841.]
We conclude that a physician had no duty to advise about or perform a eugenic abortion in New Jersey prior to Roe v. Wade. We also conclude that any duty arising in that respect after Roe v. Wade was not retroactive, for purposes of civil liability, to the date of that decision, January 22, 1973.[1] Any exception to or embellishment upon this express rule of non-retroactivity in civil cases announced in Planned Parenthood must be made by the Supreme Court.
We recite the pertinent factual and legal background for purposes of the understanding of our ruling. The plaintiff, Kelly Hummel, is a brain-damaged, multi-handicapped, 19 year-old who brought this action in 1988 for damages for extraordinary expenses incurred during her lifetime under the theory of Procanik by Procanik v. Cillo, 97 N.J. 339, 352, 478 A.2d 755 (1984). Her mother's physician, Dr. Reiss, and the hospital, St. Michael's Hospital, a Roman Catholic institution, are the defendants. Judge Feinberg dismissed the complaint "for failure to state a claim" because at the time of the pregnancy "the right to an abortion was not recognized except in a situation where there exists an immediate health threat to the mother." The *506 motion in the Law Division was really for summary judgment in favor of defendants; the record included the pleadings, depositions, answered interrogatories, and experts' reports; R. 4:6-2(e); R. 4:46; Parker v. M & T Chemicals, Inc., 236 N.J. Super. 451, 453, 566 A.2d 215 (App.Div. 1989).
On October 1, 1971 Judy Hummel was pregnant (23rd week of gestation) for the fourth time; she expected her delivery on about January 24, 1972. Her first pregnancy had ended in a miscarriage in 1965. In 1966 she had twins by caesarean section. In 1970 she had another child, also by caesarean section.
During her subject 1971 pregnancy Judy Hummel was hospitalized three times. On October 1, during the third prenatal admission, and at the end of the second trimester, Dr. Reiss concluded that she suffered from blood poisoning secondary to uterine infection. On October 2 she delivered a "macerated" stillborn fetus. Dr. Reiss told her that if she did not deliver the placenta shortly, he would perform a D & C to clear the uterus. The placenta did not appear and Judy Hummel's condition worsened. Reiss suspected she was again pregnant with twins and was carrying a second fetus. An x-ray confirmed this suspicion.
According to Hummel's testimony at deposition, she was not clearly advised of the discussions concerning whether she could have a therapeutic abortion. In any event, under her version, meetings and discussions about a possible abortion took place among the members of the medical and administrative staff, certain priests, and, probably, her now-deceased husband. She claims that the intrauterine infection worsened, her life was threatened, and she received the Last Rites of the Roman Catholic Church.
In the end, she claims the collective decision, both medically and administratively, was against a "therapeutic" abortion but to give the fetus a chance to live." Hummel said that when the decision to continue her pregnancy was revealed to her, she was *507 upset but did nothing. She did not think that she had any options. The plaintiff, Kelly, was born vaginally on October 13. At birth she weighed one pound, eleven ounces and was in "severe distress."
Dr. Reiss, the attending physician, said in his answers to interrogatories that he had "little or no recollection of many specific events before my 1983 accident." He stated that he remembered Judy Hummel but did not remember any specific conversations with her. In his interrogatories he said that, while he has no specific memory of facts or conversations, he remembered basic medicine, his moral principles, and his practices as Chief of Obstetrics and Gynecology at a Catholic hospital. He emphatically stated that he had always considered abortion to be murder. He never suggested to any woman that she have an abortion. If any patient of his wanted an abortion, he referred her to another doctor and left the decision to the patient and that doctor.
In his interrogatory answer Reiss also said that, from the records, his conclusion was that Hummel was septic probably as a result of the rupture of her membrane. The infection no doubt occurred when her water broke. He said in part:
The presence of the fetus in the uterus was a danger to her well-being. Good medicine dictated that the fetus be removed from the uterus to aid her recovery. However, under no circumstances did this mean the fetus had to be destroyed.
He added that a fetus in this situation could be delivered by caesarean section, induced by means of a drug (Pitocin), or delivered vaginally. If he had chosen either of the first two options there would have been little chance of a "normal outcome" for the fetus. He chose to wait and allow the child to be born naturally. He claimed that because the mother did well after the natural birth, this outcome indicated that he had made the correct choice in this dilemma.
Reiss said that he had been at St. Michael's for 25 years. He knew the Catholic concept of abortion and "under no circumstances would abortion be used in that hospital by me or any *508 other doctor on staff." He denied the possibility that a meeting like the one described by Hummel was possible in a Catholic hospital. He said that abortion was contrary to Catholic principles and would not have been considered at St. Michael's Hospital. Dr. Reiss admitted that Judy Hummel's life was in danger. As noted, he claimed that he had three options (c-section, induced labor or normal vaginal delivery) and chose the third, the most conservative course. He maintains that he thus met the applicable standard of care at the time.
Dr. Block, Hummel's proffered expert, claimed that her condition required uterine evacuation, "regardless of the state of gestation." He said:
evacuation of the uterus including the second fetus even in the second trimester was required in the septic situation for the benefit of the mother. The failure to do so breached the applicable standards of care and resulted in the child's birth in her brain damaged condition. Furthermore, the standard of care required that if this Catholic institution did not permit termination of this pregnancy as set forth above, the physician should have advised the mother of other institutions available to perform the procedure due to the severe risk to the mother.
He agreed that the fetus would not have survived uterine evacuation on October 1, 1971.
While there was no absolute or unfettered right to an abortion in 1971 when the plaintiff was born, Judge Feinberg correctly observed that in 1971 there was a right to an abortion "in a situation where there exists an immediate health threat to the mother." Even Dr. Reiss admitted that, "good medicine dictated that the fetus be removed from the uterus to aid [Judy Hummel's] recovery." However, he differentiated between "abortion" and "evacuating the uterus," saying that evacuating the uterus could have been done by removal of the fetus by caesarean section, inducing labor by use of the drug, Pitocin, or by waiting for natural delivery. Reiss claimed that although evacuating the uterus was necessary for the well-being of Judy Hummel, "under no circumstances did this mean that the fetus had to be destroyed." Reiss did agree that in the first two *509 instances, caesarean section and induced labor, the chance of a "normal outcome" or life for the fetus was unlikely.
Judy Hummel also claimed in depositions that Reiss actually did tell her that she could chose to abort the fetus because the fetus would be born very handicapped or not make it at all. Either way, abortion or not, he said Judy Hummel could still die. Unfortunately, Reiss seems to have no memory of the actual facts of this case due to his accident in 1983. He relies only on what he now believes was his procedure in like cases at that time. He offers no real clarification of his nominal differentiation between "evacuation of the uterus" and "abortion." We can only conclude from this record that Judy Hummel legally could have had a therapeutic abortion but that none was sincerely offered to her at the time.
If this scenario had taken place after Roe v. Wade, the child, Kelly Hummel, might well have had a right of action under Berman v. Allan, 80 N.J. 421, 432, 404 A.2d 8 (1976), and Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834 (1981), if Judy Hummel could prove that she had been wrongly deprived of advice on and the choice of terminating the pregnancy. But see the "Conscience Act," N.J.S.A. 2A:65A-1 and -2. The Berman and Schroeder cases reexamined and revised the no-duty rule expressed in Gleitman v. Cosgrove, 49 N.J. 22, 31, 227 A.2d 689 (1967). As noted, in Procanik, 97 N.J. at 352, 478 A.2d 755, the cause of action was extended to the damaged child but only as to extraordinary expenses. See also Arche v. United States, 247 Kan. 276, 798 P.2d 477 (1990) (21 jurisdictions now recognize this cause of action), and Turpin v. Sortini, 31 Cal.3d 220, 238, 643 P.2d 954, 965, 182 Cal. Rptr. 337, 348 (1982).
We recognize the Supreme Court's language in Procanik which states that the duty of care extends to the child. 97 N.J. at 348, 478 A.2d 755. See also Justice Handler's statement in Berman v. Allan, concurring in part and dissenting in part, that the duty owed to mother "enveloped a duty to the unborn child. The breach of that duty affects both." 80 N.J. at 444, *510 404 A.2d 8. We are also aware of case law in several other jurisdictions susceptible of the interpretation that failure to advise concerning the likelihood of a severely defective child and to at least offer the clear opportunity to go and get a genetic abortion prior to Roe v. Wade is actionable. See Dumer v. St. Michael's Hosp., 69 Wis.2d 766, 233 N.W.2d 372, 377 (1975) (in claim arising from 1972 pregnancy "to complete a cause of action the plaintiffs must then convince the trier of fact that they would have sought and submitted to an abortion on the wife and that the abortion was legally available to them."); accord Jacobs v. Theimer, 519 S.W.2d 846 (Texas Sup.Ct. 1975); see Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978) (failure to advise of genetic probability of repetitive defective fetus actionable pre-Roe v. Wade), and Call v. Kezirian, 135 Cal. App.3d 189, 185 Cal. Rptr. 103 (1982) (must advise Downs Syndrome expectant mother in 1972 pregnancy); contra, Stewart v. Long Island College Hosp., 35 A.D.2d 531, 313 N.Y.S.2d 502 (1970) (no duty to fetus pre-Roe v. Wade where no right to a therapeutic abortion under state law). But whatever the implications or merits of these theories, we conclude that we are bound by the nonretroactivity ruling applicable to civil claims involving pre-1973 abortions as expressed in Planned Parenthood, 75 N.J. at 52, 379 A.2d 841. The failure to advise the pregnant mother and thus to permit her to arrange for the opportunity for a eugenic abortion in New Jersey before Roe v. Wade was decided on January 22, 1973 cannot under our current law be a basis for an action for damages for extraordinary expenses caused by "wrongful life" of a child saddled with birth defects. Any revision of the ruling in Planned Parenthood, especially after the passage of 14 years, is for our Supreme Court, not for one of seven panels of an intermediate appellate court. See Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 35, 427 A.2d 1121 (App.Div. 1981).
Before Roe v. Wade, the only legal duty was to the mother. That duty was to perform a therapeutic abortion if her health *511 or life was endangered. Breach of that duty causing damage to the mother is not the claim here. There was no duty in New Jersey in 1971, breach of which was actionable for damages, to either the mother or to the unborn child to advise about, arrange the opportunity for, or to perform a eugenic abortion where a severely defective but viable fetus was probable. The claim is not actionable.
Affirmed.
NOTES
[1] The so-called Conscience Act, N.J.S.A. 2A:65A-1 to -4, L. 1974, c. 111, effective October 2, 1974 purported to insulate physicians and at least nonprofit, private sectarian hospitals from any obligation to do abortions post-Roe v. Wade. See Doe v. Bridgeton Hospital Ass'n, Inc., 71 N.J. 478, 491, 366 A.2d 641 (1976).